**LAVERNE INTERNATIONAL, LTD.,**
**Plaintiff,**

v.

**AMERICAN INSTITUTE OF INTERIOR DESIGNERS, INCORPORATED,**
**Defendant.**

No. 69 Civ. 3566.

United States District Court,
S. D. New York.

Jan. 11, 1973.

Darby & Darby, New York City, for plaintiff; Gordon D. Coplein, New York City, of counsel.

Nims, Halliday, Whitman, Howes, Collison & Isner, New York City, for defendant; Oliver P. Howes, Jr., New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

This is an action for alleged infringement [1] of a trademark and serv-

ice mark [2] registered in the United States Patent Office, and an alleged violation of the New York General Business Law, § 368-d, the dilution statute.[3] The only remedy plaintiff seeks is a permanent injunction prohibiting defendant and its members from using defendant's trademark, also registered in the United States Patent Office.

After hearing the testimony of the parties, examining the exhibits and the Proposed Findings of Fact and Conclusions of Law submitted by counsel this court makes the following Findings of Fact and Conclusions of law:[4]

## FINDINGS OF FACT

1. This court has jurisdiction over the persons and subject matter of this law suit under 15 U.S.C. §§ 1114, 1121 and 1125(a) and 28 U.S.C. §§ 1338(a) and 1338(b).

2. Plaintiff, Laverne International, Ltd. ("Laverne") is a corporation of the State of New York, having its principal place of business at 979 Third Avenue, New York, N. Y. (Tr. 5.) [5]

1. The test used to determine if there has been an infringement is found in 15 U.S.C. § 1114(1). That section states:
    "Any person who shall, without the consent of the registrant—
    (a) use in connection any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
    (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to mistake, or to deceive."

2. 15 U.S.C. § 1127 defines "trademark" and "service mark" as follows:
    *Trademark:* "The term 'trademark' includes any word, name, symbol, or device

or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others."
    *Service mark:* "The term 'service mark' means a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others."

3. New York General Business Law § 368-d (McKinney 1968) states that:
    "Likelihood of injury to business reputation or dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

4. An attempt was made during the trial to secure a consent decree (Tr. 334–335) and the court has accordingly disregarded it.

5. Numbers in parentheses refer to the stenographic minutes of the trial before this court on October 10, 11, 12, 1972.

3. Defendant, American Institute of Interior Designers, Incorporated ("AID"), is a corporation of the State of Illinois, having its national headquarters at 730 Fifth Avenue, New York, N. Y. (349.)

4. Laverne is a member of defendant-organization. (145.)

5. Laverne designs, manufactures, processes, distributes and sells items and products used in the field of interior design and decoration. (5, 8, 9.) These items and products are used in homes, offices, buildings, art galleries and other interior areas. (5, 8, 71.)

6. Laverne also renders services to interior designers, decorators, architects and other professional persons who work in the field of interior design and decoration. (77.)

7. Laverne does not deal with the public although the public is permitted to enter Laverne's show room, where there is a sign stating, "FOR TRADE ONLY." (145–146.) Laverne's customers include professional decorators, architects, interior designers, contract buyers, department stores, dealers and art galleries. (71.)

8. Laverne owns United States Trademark Registration No. 813,851, granted August 30, 1966 (Ex. 5), which is used on some or all of its products. (155–156.)

9. Laverne owns United States Service Mark Registration No. 845,612, granted March 14, 1967 (Ex. 6), which is used by Laverne when it renders services in the field of interior design.

10. There is no distinction in the trademark or service mark used by Laverne. They are identical. (Exs. 5, 6.)

11. Laverne had the right to use the marks with or without the name "Laverne" (Exs. 5, 6), although the name "Laverne" has always been used directly with or in conjunction with the trademark and service mark. (Exs. 2, 9, 11, 13, 14, 15, 17, 18, 19.)

12. The name "Laverne" has been used without the trademark or service mark. (Exs. 1, 16, 48.)

13. Laverne has used both the trademark and service mark in connection with its business since July 1964. (Exs. 5, 6.)

14. Laverne used the trademark and service mark in its advertising exclusively in professional interior design and trade publications prior to March 1967. (Ex. 11; 23–33, 164.) There was, however, no extensive advertising by Laverne prior to March 1967.

15. Since 1964 Laverne has used its trademark or service mark on its products, stationery, catalogues and publications. (Exs. 5, 6; 228.)

16. Defendant, AID, is a professional organization with a membership consisting of persons within the profession of interior design and decoration and related fields. (352–360.) AID is engaged in the advancing of the professions relating to interior design and decorating. In conjunction with this, AID establishes the academic, practical and technical background which a person should have in order to practice in the field of interior design and decoration. (351, 353.) Additionally, it establishes a code of professional ethics and practices to which the profession should adhere. (353–358.)

AID also does research and publishes papers and pamphlets on a variety of professional matters relating to the field of interior design and decorating. While its membership is substantial in size, its standards for membership are strictly enforced. (353–358, 394; Exs. 36, 38.)

AID does not manufacture, distribute or sell any items, products or goods. (353, 360, 396–397.) It does not render any services for compensation to anyone outside its membership.[6]

17. Prior to the commencement of this action a significant number of Lav-

<hr>

6. AID did at one time have for sale to the public a publication. However, it was a financial loss and has been discontinued. (Ex. 34; 397.)

erne's clients were or are presently members of AID. (147.)

18. Some of the members of AID are involved in the manufacturing, processing and distribution of goods and services in the field of interior design and decoration. (399–400.) In addition, some of AID's members are in competition with Laverne; others are customers of Laverne. (74–75, 147–149.)

19. In 1966 AID hired a graphic designer to design a trademark to be used within its organization and by its chapters.[7] AID subsequently adopted the design submitted; it was introduced into the field of interior design in March of 1967. (Ex. 21) and AID commenced use of the newly adopted trademark in June of 1967. (389; Ex. 55) The membership, however, was not to use the trademark. (299–300, 313–314, 387–388.)

20. AID has used the trademark with and without the name "American Institute of Interior Design, Inc." or the initials "AID" or some combination thereof. (Ex. 52, I–1, p. 1; 299–300, 314, 387–388.)

AID uses its trademark on its stationery, publications, certificates of membership, awards, distributions to its chapters and members, schools, professional institutions, the public and anyone who makes an inquiry about their activities. (375–378; Exs. 26, 28, 30.)

21. AID owns United States Trademark Registration No. 882,239, granted December 9, 1969, for use by an "association services in the field of interior design." (Ex. 55; 389–390.)

22. AID has prohibited the use of its trademark by any member of AID with respect to business solicitation or otherwise. (Ex. E; 363, 413, 416.)

23. Defendant AID does not compete with plaintiff Laverne.

24. There is no confusion between the use of the Laverne trademark and the use of the AID trademark as they are used. (156.)

---

7. AID is made up of regional chapters to which the individual members belong.

## DISCUSSION

The gist of any action under this chapter is whether the alleged infringing trademark is "likely to cause confusion or mistake" as to the source of origin of such goods or services. Societe Comptoir De L'Industrie Contonniere Establissements Boussac v. Alexanders Dept. Stores, Inc., 299 F.2d 33, 36 (2d Cir. 1962). This right to be protected not only is designed to protect similar goods in the market but also the palming off or the taking of a free ride on the plaintiff's reputation. American Steel Foundries v. Robertson, 269 U.S. 372, 380, 46 S.Ct. 160, 70 L.Ed. 317 (1926); Franchised Stores of N. Y., Inc. v. Winter, 394 F.2d 664 (2d Cir. 1926); Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961). The mere possibility that the practices of the second user of the trademark may stain the owner's reputation in the minds of his customers is also enough to afford the infringed right to be protected. Johnson & Son v. Johnson, 175 F.2d 176 (2d Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L. Ed. 527 (1949).

Thus, the thrust of trademark infringement litigation is found in the possibility of confusion among the purchasing public with respect to whose goods or services are being offered for sale. American Steel Foundries, supra. Trademark infringement litigation is, therefore, not generally involved with the sophisticated customer, as here (Findings of Fact 7, 14), but confusion among the purchasing public.

The reason for such appears to be that the more sophisticated the purchaser the less likely the possibility of confusion; that is, the sophisticated buyer is not likely to make a purchase of a product with a trademark similar to that of a competitor's believing that the product he is purchasing is from another source. See LaTouraine Coffee Co., Inc. v. Larraine Coffee Co., Inc., 157 F.2d 115 (2d

---

There are 41 chapters and over 3,500 members. (352–360.)

Cir. 1946). In addition, the more sophisticated the customer the less likely the possibility of there being any damage or harm to the trademark owner's reputation, even where both parties are in direct competion.

While there is no touchstone or dogmatic principle which can be applied in evaluating the presence of the "likelihood of confusion," several criteria have developed which the court should consider in determining the possibility of confusion. These criteria involve "the strength of the mark; the degree of similarity between the two marks; the proximity of the products; * * * actual confusion, the reciprocal of the defendant's good faith in adopting its own mark; the quality of defendant's product; and the sophistication of the buyers." Kiki Undies Corp. v. Promenade Hosiery Mills, Inc., 411 F.2d 1097, 1099 (2d Cir. 1969).

■ From a balancing of these considerations, the court then determines whether or not the parties are entitled to the relief or protection sought. Kiki Undies, supra. However, there has also developed a trademark law maxim that each case must be decided upon its peculiarities. Modular Cinemas of America, Inc. v. Mini Cinemas Corp., 348 F.Supp. 578, 582 (S.D.N.Y.1972). Thus, the mere presence or absence of any particular consideration is not determinative of a particular case, Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196 (2d Cir. 1962), and in the final analysis the decision must rest on the court's conviction as to possible confusion. Miles Shoes, Inc. v. R. H. Macy & Co., Inc., 199 F.2d 602 (2d Cir. 1952).

■ "A trade-mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his. . . . When the mark is used in a way that does not deceive the public we see no such sanctity in the [mark] as to prevent its being used to tell the truth." Prestonettes, Inc. v. Coty, 264 U.S. 359, 368, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924). This principle established early in trademark litigation the necessity of deception or the palming off of one's goods as those of another to have protection available.

In Dawn Donut Company v. Hart's Food Stores Inc., 267 F.2d 358, 364 (2d Cir. 1959) the statutory requirement of "likelihood of confusion" was restricted. The court's discussion noted:

> "The registrant may enjoin only that concurrent use which creates a likelihood of public confusion as to the origin of the products in connection with which the marks are used. Therefore if the use of the marks by the registrant and the [alleged] unauthorized user are confined to two sufficiently distinct and geographically separate markets, with no likelihood that the registrant will expand his use into the defendant's market, so that no public confusion is possible, then the registrant is not entitled to enjoin the junior users use of the mark."

Plaintiff's primary witness in this action has testified that Laverne deals only within the profession of interior design, both in the sale of its products and the rendering of its services as a consultant. (Findings of Fact 5, 6.) Thus, Laverne restricts its customers and clients to a sophisticated, highly trained or well educated class of individuals. (Finding of Fact 7.)

In addition, plaintiff's advertisement has been confined exclusively to trade and professional publications and was not extensive.[8] (Finding of Fact 14.)

---

8. When Laverne adopted its trademark it did send out a mailing with the trademark enclosed (Exs. 8, 9, 9A; 23–29); and although the total of such mailings was large it again was mailed solely to those within the profession of interior design and decoration, many of whom were or are members of AID. AID did at one time have an order form available for use by its membership but it has been discontinued. (Exs. 26, 28, 30; 375–378.)

It was clearly a campaign designed to contact the professional customer and client.

Laverne's highly sophisticated customers and clients, many of whom belong to AID (Finding of Fact 18), and the fact that the AID trademark has never been used on any products (Finding of Fact 16), make it highly unlikely that any of Laverne's customers would confuse either of the trademarks.

While it is not necessary to show instances of actual confusion, but merely the possibility of such, *Kiki Undies*, supra, a consideration of such instances is not inappropriate. Polaroid Corp., supra. In this instant action, when plaintiff's primary witness was questioned with respect to any instances of confusion that he knew of, he testified that he knew of none, nor had any of his clients or anyone else made any inquiries as to whether defendant's trademark was that of plaintiff. (Finding of Fact 24; 156.)

There is also some doubt as to whether the actual consumer of plaintiff's product ever gets to see the Laverne name or trademark. (162, 235–239.)

## DISSECTION

Laverne, during trial, in an attempt to display the similarities of the marks, alleged that they were made up of the same component elements. (133–140.) The court, ruling that a demonstration of such was not governed by the rule prohibiting the dissection of a trademark, Schlitz Brewing Co. v. Houston, 250 U.S. 28, 39 S.Ct. 401, 63 L.Ed. 822 (1919), but also noting that it is well settled that the trademark must be considered as a whole, as the public sees it in the market, permitted the reconstruction of the two marks. (Ex. 54.)

The court, however, upon the submission of the demonstration (Ex. 54), within its discretion to make an ocular examination of the two marks, Eastman Kodak Co. v. Fotomat Corporation, 317 F.Supp. 304, (N.D.Ga.), appeal dismissed, 441 F.2d 1079 (5th Cir. 1971), saw no merit in such a demon-

stration, noting that plaintiff's trademark is always used with the name "Laverne." (Finding of Fact 11.)

Although AID has restricted its membership's use of the AID trademark (Finding of Fact 22) and Laverne has never used its trademark or service mark without the name "Laverne" (Finding of Fact 11), this court has determined that because there might be confusion as to the source of publications and other materials distributed to the public by AID or Laverne, there is a necessity for a restriction on AID's use of its trademark.

Therefore, plaintiff is entitled to an injunction prohibiting AID from use of its trademark without its name or initials, so that on its publicly-distributed materials or other materials to which the public may come in contact, the trademark is to have no greater visual impact than its name or initials being used in conjunction with the trademark.

## DILUTION

Plaintiff also stressed the dilution doctrine. The thrust of a dilution complaint is that the continuing use of a particular mark similar to plaintiff's will have an adverse effect upon the value of plaintiff's mark and that, if plaintiff is not protected, its mark will eventually lose its distinctiveness. However "[T]his injury differs materially from that arising out of the orthodox confusion; . . . Such confusion leads to immediate injury, while dilution is an infection which, if allowed to spread, will inevitably destroy the advertising value of the mark." Polaroid Corp. v. Polaraid, Inc., 319 F.2d 830, 836 (7th Cir. 1963).

Section 368-d of the New York General Business Law, McKinney's Consol. Laws, c. 20, entitled, "Injury to business reputation; dilution," is the applicable statute on this issue. Significantly, however, the doctrine of protection of the good will, for which the section was designed to protect, has been applied sparingly. As Mr. Justice Thomas A. Aurelio stated in Cue Publishing Compa-

ny v. Colgate-Palmolive Company, 45 Misc.2d 161, 256 N.Y.S.2d 239, aff'd, 23 A.D.2d 829, 259 N.Y.S.2d 377 (1965):

"It would appear therefore, and the cases have so held, that to give effect to the dilution doctrine some measure of confusion must be present and in those cases where it was found to exist the rights of the senior user were upheld. [Citations omitted.]" 45 Misc.2d at 168, 256 N.Y.S.2d at 245.

See also Geisel v. Poynter Products, Inc., 295 F.Supp. 331 (S.D.N.Y.1968).

Thus, the decisions of the New York courts in cases involving the anti-dilution statute have depended upon some confusion, fraud, deception or palming off where injunctive relief has been awarded. Plaintiff has not demonstrated the existence of any of these elements here.

■ This court is also satisfied that the commercial status and reputation and stature of defendant-organization is such that the likelihood of injury to business reputation is non-existence. Plaintiff has offered no evidence to the contrary. See King Research, Inc. v. Shulton, Inc., 324 F.Supp. 631 (S.D.N.Y.1971), aff'd, 454 F.2d 66 (2d Cir. 1971).

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the subject matter and parties of this suit.

2. Defendant's use of its trademark is clearly different from plaintiff's use of its trademark.

3. Defendant has not competed with plaintiff in defendant's use of its trademark.

4. Defendant's use of its trademark and the manner in which it conducts its business, except for its use on publicly displayed and distributed materials, is not likely to cause confusion among the public and does not constitute a threat to plaintiff's good will.

5. Plaintiff is entitled to an injunction prohibiting defendant from the use of its trademark without the name or in-

itials or its organization so that on defendant's publicly-distributed materials, or materials distributed to its membership that the public may come in contact with, defendant's trademark is to have no greater visual impact than defendant's name or initials being used on such materials. Thus:

(A) Defendant's trademark is always to be used only in conjunction with its name or initials;

(B) Defendant shall not use its trademark on any certificates of award unless the name or initials of its organization are inserted;

(C) Defendant shall, within two years from the date of this judgment, reissue membership certificates which shall contain the name or initials of its organization.

6. Plaintiff has not demonstrated the existence of any elements necessary for protection under New York Business Law § 368-d (McKinney 1968), the dilution doctrine.

7. Neither plaintiff nor defendant is entitled to costs.

Settle judgment promptly upon notice.