**Gregory D. SCOTT, d/b/a GHQ**

v.

**MEGO INTERNATIONAL, INC., a corporation, and Mego Corp., a corporation.**

Civ. No. 4–77–206.

United States District Court,
D. Minnesota,
Fourth Division.

July 16, 1981.

1120

Allen W. Hinderaker, of Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, Minn., for plaintiff.

Bertram Frank and Murray I. Franck, of Bertram Frank, P. C., New York City, and Conrad A. Hansen, of Williamson, Bains, Moore & Hansen, Minneapolis, Minn., for defendants.

## MEMORANDUM OPINION AND ORDER FOR JUDGMENT

DIANA E. MURPHY, District Judge.

Plaintiff, Gregory D. Scott, d/b/a GHQ, brought this action for common law and statutory trademark infringement, trademark dilution, false designation of origin, and deceptive trade practices against defendants, Mego International, Inc. and Mego Corp. Defendant Mego Corp. counterclaimed, seeking cancellation of plaintiff's registered marks. Jurisdiction is asserted under 28 U.S.C. § 1338(a) and (b), 15 U.S.C. § 1121, and pendent jurisdiction.

The action was bifurcated—the liability issues and the claims for injunctive relief and cancellation were tried to the court; the issue of damages was reserved for trial by jury. During the course of the seven week trial to the court, twenty witnesses testified, portions of sixteen depositions and numerous answers to interrogatories were read into the record, and hundreds of documents and other exhibits were received into evidence.

Plaintiff's second amended complaint sets forth five claims. The first claim alleges that defendants' use of the trademark Micronauts for a line of toys constitutes a false designation of origin and a false description and representation in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The second claim arises under the common law and alleges that defendants' use of the trademark Micronauts constitutes an infringement of plaintiff's trademark Micro Nauts, that the use is likely to be deceiving, confusing, and misleading to the trade and to the public, and that it is likely to cause them to believe that defendants' products are manufactured and sold by plaintiff and/or that plaintiff's products are manufactured and sold by defendants. The third claim arises under section 32 of the Lanham Act, 15 U.S.C. § 1114, and alleges that defendants' use of the trademark Micronauts constitutes an infringement of plaintiff's trademark Micro Armour, that the use is likely to be deceiving, confusing, and misleading to the trade and public, and that it is likely to cause them to believe that defendants' products are manufactured and sold by plaintiff and/or that plaintiff's products are manufactured and sold by the defendants. The fourth claim arises under the common law and alleges that the defendants' use of the trademark Micronauts will dilute the distinctiveness of plaintiff's trademarks Micro Nauts and Micro Armour, tarnish the affirmative association that plaintiff's trademarks enjoy, as well as the plaintiff's reputation, and destroy the advertising value of the trademark to plaintiff. The fifth claim arises under the Minnesota Deceptive Trade Practices Act, Minn.Stat. § 325.771, *et seq.*, and alleges that the defendants' use of the trademark Micronauts is a deceptive trade

practice in that it (a) is likely to cause confusion and misunderstanding as to the source, sponsorship, or approval of their products and (b) it will disparage the goods and business of plaintiff by the false or misleading representation of fact that plaintiff's products are manufactured by defendants.

Plaintiff seeks the following relief: (1) an order restraining and enjoining defendants from using the name Micronauts; (2) cancellation of Mego Corp.'s registration of the trademark Micronauts; (3) actual damages, as well as costs, disbursements and reasonable attorneys' fees; (4) exemplary damages of $1,000,000.

Defendants Mego International, Inc. and Mego Corp. denied in separate answers that they unfairly competed with plaintiff, that they infringed or diluted plaintiff's trademarks, and that use of the trademark Micronauts constituted an unfair trade practice. Defendants also denied that they committed intentional, willful or wrongful acts in disregard of the rights of plaintiff or the public. Defendant Mego Corp. pleaded four affirmative defenses: (1) that personal jurisdiction is lacking; (2) that it does not manufacture, use, sell, offer for sale, or advertise any products bearing the trademark Micro Armour; (3) that there is no likelihood of confusion as to the origin of goods since the respective products of the plaintiff and of Mego Corp. to which the mark Micronauts is applied are entirely different; (4) that plaintiff obtained the registration of its trademark Micro Nauts by virtue of a fraud perpetrated upon the United States Patent and Trademark Office, by falsely identifying products on which the trademark was not used and was not intended to be used. Defendant Mego International, Inc. pleaded the same affirmative defenses listed as 1, 2, and 4 above and also pleaded as an affirmative defense that it does not manufacture, use, sell, offer for sale, or advertise any products bearing the trademark Micro Nauts.

Defendant Mego Corp. filed two counterclaims. The first counterclaim alleges that the plaintiff perpetrated a fraud on the Patent and Trademark Office in obtaining registration of the Micro Nauts mark by falsely identifying the nature of the goods on which the mark was used. The second counterclaim alleges that the words Micro Armour are merely descriptive of the goods with which they are associated. Mego Corp. seeks a declaratory judgment (a) declaring that the trademark registration of Micro Nauts is invalid, void and unenforceable; (b) directing the Commissioner of Patents and Trademarks to strike the trademark Micro Nauts from the Principal Register of the United States Patent and Trademark Office; (c) declaring that the trademark Micro Armour is invalid, void, and unenforceable; (d) directing the Commissioner of Patents and Trademarks to strike the trademark Micro Armour from the Principal Register; (e) granting Mego Corp. its costs and disbursements of this action, including reasonable counsel fees; and (f) granting other relief as the court may deem just and proper. Plaintiff denies that a fraud has been committed on the United States Patent and Trademark Office for which cancellation of the trademark Micro Nauts is proper and further denies that the name Micro Armour is merely descriptive.

The court has carefully considered all testimony, depositions, answers to interrogatories, and exhibits presented at trial and all arguments and memoranda of counsel. The court hereby enters this Memorandum Opinion and Order for Judgment as its findings of fact and conclusions of law as required under Rule 52(a) of the Federal Rules of Civil Procedure.

## I. Background Facts

### A. Plaintiff

Gregory D. Scott is the owner of the sole proprietorship known as GHQ. GHQ, whose name was chosen to be reminiscent of the military term "General Headquarters," manufactures two lines of highly realistic military miniatures which are cast out of tin and lead and sold under the names Micro Armour and Micro Nauts. The products sold under the name Micro Armour are 1:285 scale recreations of tanks, trucks, infantry, artillery and other military

pieces. The products sold under the name Micro Nauts are 1:1200 and 1:2400 scale recreations of naval vessels of the Napoleonic and World War II eras.

The primary target of Scott's products is for use in historical wargaming, a hobby in which the players assume and play out roles in military settings. Wargames are sold in several varieties. Some are sold with boards and cardboard counters which represent military units or strength values. Some wargamers use military miniatures in place of such cardboard counters. Military miniatures are also used in games which may be marketed only as a set of rules or rule books. Players may construct their own terrain on the floor or in a sandbox on which to play games of this type. Whether the games are board or non-board games, play consists of simulating military battles, usually based on historical fact or existing military forces.

GHQ was one of the first companies to manufacture scale military miniatures. When Scott formed the company in 1968, the hobby of wargaming was beginning to attract more interest, and the industry of producing wargaming materials was developing. GHQ's business expanded as the interest in wargaming increased. In 1973, gross sales totalled $25,611.90.[1] By 1979, that figure had risen to $163,908.

Scott, himself a wargamer, began with the production and sale of the Micro Armour line and first sold products under that name in interstate commerce in 1968. Scott testified that he chose that name because "Micro" suggests a small size and "Armour" suggests the nature of the item represented by the miniatures. On November 19, 1975, Scott filed an application with the United States Patent and Trademark Office to register the mark Micro Armour. In his application, Scott indicated that the mark was used for "toy soldiers and miniature military apparatus." Registration was initially denied because the examiner considered the mark to be merely descriptive of the goods.

After correspondence from Scott's counsel, however, the examiner agreed to approve registration on the condition that Scott disclaim exclusive rights to the word "armour." A certificate of registration was issued on March 8, 1977, entering Micro Armour on the principal trademark register but clearly indicating the disclaimer.[2]

Scott began selling his other product line, Micro Nauts, in interstate commerce in 1975. Scott testified that he instructed his counsel to begin proceedings to obtain registration of the Micro Nauts mark as early as 1975. However, the application to register the name with the Patent and Trademark Office was not filed until April 11, 1977, after Scott became aware of defendant Mego's use of the name Micronauts for its line of children's toys, and after Mego had received from the United States Patent and Trademark Office a certificate registering that name. In his application to register Micro Nauts, Scott indicated that the name was used for "cast metal miniature toys." A certificate of registration was issued to Scott on October 25, 1977, entering Micro Nauts on the principal register of the Patent and Trademark Office.

Scott's principal merchandising method has been to utilize representatives and distributors who represent various manufacturers. The representatives and distributors in turn deal with a variety of stores. Scott's products are sold principally in hobby stores and wargaming specialty shops and in a small number of toy stores that carry hobby items. In addition to retail sales in stores, Scott also does some direct mail order business.

One method by which Scott maintains direct contact with the purchasing public and the trade is by attending numerous consumer and trade conventions, including the Hobby Industry of America Show, the principal trade convention in the hobby industry, and the Origins convention, the principal war gaming consumer convention.

---

1. Financial statements for years prior to 1973 were not submitted into evidence.

2. The certificate indicated that "No claim is made to the exclusive right to use the word 'Armour', but applicant waives none of its common law rights therein."

Scott has never displayed GHQ products at the New York Toy Fair, a principal convention in the toy industry.

Another method by which Scott maintains contact with the purchasing public and the trade is through advertising and press releases. Since 1975, 80 percent of GHQ's advertising budget has been spent on advertising to the trade. GHQ also advertises in consumer publications—the most often employed consumer advertising outlet has been *Wargamer's Digest*, a publication specializing in wargaming. Most of the consumer advertising informed purchasers that the products could be obtained at their "favorite hobby dealer." In 1978 and 1979, after this suit was begun, Scott also placed advertisements for GHQ products in *Boy's Life*, a magazine with a more general distribution.

Since 1974, Scott's products have been packaged in "blister packs," a common form of packaging in which the product is visible through clear plastic mounted on cardboard. The letters GHQ have always appeared with the words Micro Armour and Micro Nauts on the front of this packaging. Information contained on the back of the packages has included statements that the purchasers can expect reliability, not only from the manufacturer, but also from "your hobby dealer," and that the products are available at "quality shops." In 1980, well after this lawsuit was begun and shortly before trial, Scott planned a new packaging layout. The information on the back of the new packaging will indicate that purchasers can expect reliability from their "dealer" and that the products are available at "quality toy and hobby shops."

### B. *Defendants*

Defendant Mego International, Inc. is a corporation organized under the laws of Delaware which owns both domestic and foreign subsidiary companies. Defendant Mego Corp. (Mego), a New York corporation with its principal offices in New York City, is a wholly owned subsidiary of Mego International. Mego is in the business of manufacturing, selling, and distributing toys and games.

Mego sells a wide variety of toys and games throughout the United States and in some foreign countries. Some of these products are manufactured in plants owned by Mego International. The products include dolls and doll costumes, stuffed toys, and electronic toys and games. Mego relies principally on mass marketing techniques to sell its products, and its customers are primarily chain stores, discount stores, and department stores. The principal method of attracting the purchasing public is through television advertising.

In early 1976, a California consulting firm, working in the area of toy development, presented Mego with the idea of purchasing a line of toys from a Japanese company. Mego then began negotiations with the Japanese company, Takara Co., Ltd., for the purchase and/or licensing of a line of toys that was then being marketed in Japan under the name Microman. The line consisted of futuristic, space-oriented items, constructed largely of plastic, and designed for ages 6 to 11. It was felt that the line of toys could capitalize on the Star Trek and Star Wars craze. The line included many varieties, ranging from space figures approximately five inches tall to galactic cities that, when assembled, could cover a twenty-foot area. In April, 1976, Mego and Takara entered into an agreement whereby Mego obtained the right to sell this line in the United States, under a name to be chosen by Mego.

Mego first considered using the name Microman, but ruled it out upon the advice of counsel after a trademark search had been conducted. Mego next considered Micronauts as a shortened version of Micro-Astronaut. A trademark search, reported on June 7, 1976, revealed no existing registrations or pending trademark applications for Micronauts or Micro Nauts. Mego then filed an application with the United States Patent and Trademark Office in July, 1976, to register Micronauts, indicating on the application that the name was used for "dolls, doll clothing and playsets, namely, simulated environmental areas and accessories therefor." The application was published for opposition, and no opposition to

the registration of Micronauts was received. A certificate of registration was issued Mego on February 22, 1977, entering Micronauts on the principal trademark register. The certificate indicates that the trademark examiner was W. A. Conn, whose name also appears as the trademark examiner on the registration certificate subsequently issued to Scott for GHQ's Micro Nauts.

The processes of manufacturing, advertising planning, package design and development, and importation of Micronauts began in the latter half of 1976. The first shipment in the United States of toys using the name Micronauts occurred in June, 1976. Scott first became aware of Mego's Micronauts during the New York Toy Fair in February, 1977, at which Mego made its first major presentation of the line to the public and trade.

Mego marketed its Micronauts line across the United States from early 1977 until mid 1980, when Mego discontinued the line and sold its existing stock. During this time, Mego's wholesale sales of Micronauts totalled approximately $77 million, while retail sales were approximately double that figure.[3] Mego marketed the line through distributors and direct sales to stores. Micronauts were sold in many types of stores, principally department stores, discount retail stores, and toy stores.

Mego heavily advertised the Micronauts line, expending nearly $10 million for television advertising of Micronauts between 1977 and the end of 1979. The television commercials were geared at two target audiences—children aged 6 to 11 and the adults who might purchase the toys for such children. Mego purchased both nationwide and local television time during children's programming and early evening family programming.

Mego's Micronauts were packaged in a variety of ways—the larger items in boxes, the smaller items in blister packages. The packaging was multi-colored and otherwise eye-catching and was designed to encourage impulse buying. The Mego logo appeared on all Micronauts boxes and blister packages.

II. *Personal Jurisdiction*

Both defendants have claimed that this court lacks personal jurisdiction over them. Before the case was transferred to this court, motions to dismiss for lack of personal jurisdiction were denied by The Honorable Miles W. Lord (Mego International, Inc.) and The Honorable Harry H. MacLaughlin (Mego). Mego International, Inc. renewed its motion at the time of trial.

 This court may exercise personal jurisdiction over a nonresident defendant if there exist "minimum contacts" between the defendant and the state of Minnesota. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 561, 62 L.Ed.2d 490 (1980); *Rush v. Savchuk*, 444 U.S. 320, 100 S.Ct. 571, 573, 62 L.Ed.2d 516 (1980); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The nonresident defendant's contacts with the state must be such that maintenance of the suit in this district does not offend "traditional notions of fair play and substantial justice." *Id.* at 316, 66 S.Ct. at 158.

 Defendant Mego's products are distributed and sold throughout the United States, including Minnesota. It advertises on national and local television, its salesmen periodically visit stores in Minnesota, and its products are shipped to stores in the state. Mego is clearly doing business in Minnesota and has sufficient contacts with the state to form the basis of this court's exercise of personal jurisdiction. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Aftanase v. Economy Baler Co.*, 343 F.2d 187 (8th Cir. 1965).

 Since defendant Mego International, Inc. is itself not directly involved in Minnesota, the jurisdictional issue presented in its case is somewhat different. A nonresident parent corporation may subject itself to jurisdiction in a state by virtue of

---

**3.** Sales volumes were highest from 1978 to 1979, and then dropped off dramatically prior to Mego's discontinuance of the Micronauts line.

the activities of its subsidiary company in that state. *Lakota Girl Scout Council, Inc. v. Havey Fund-Rais. Man., Inc.*, 519 F.2d 634 (8th Cir. 1975); *Fisher v. First National Bank of Omaha*, 338 F.Supp. 525 (S.D. Iowa), *appeal dismissed*, 466 F.2d 511 (8th Cir. 1972). In order for the parent company to subject itself to jurisdiction by virtue of its subsidiary's activities, the companies must be organized and operated so that the one corporation is an instrumentality or adjunct of the other corporation.

■ Defendant Mego International, Inc. conducts business through its wholly-owned subsidiaries which are closely interrelated. Mego International maintains offices at the same location as defendant Mego. Both of the directors of Mego are also directors of Mego International. A number of the same people are officers of both corporations. Mego International and its subsidiaries issue consolidated summaries of operations, financial statements, statements of income, statements of changes in financial position, and statements of shareholders' equity. Mego International and the domestic subsidiaries file consolidated federal income tax returns, and Mego International guarantees the credit facility of its domestic subsidiaries and funds their pension plans.

Mego International holds itself out to the public as having substantial control over its subsidiaries, including Mego, and its annual report and other financial documents reveal that it does, in fact, have such control. The parent-subsidiary relationship appears to be a convenient means for Mego International to organize its domestic and international business. The Mego International prospectus indicates that Mego International was incorporated "for the purpose of continuing in one venture the business and management of Mego Corp., a New York corporation, and Lion Rock Trading Co., Limited, a Hong Kong corporation."[4]

Because of the nature of the parent-subsidiary relationship and the activities in

Minnesota of its wholly-owned subsidiary, defendant Mego, this court also has personal jurisdiction over defendant Mego International, Inc.

III. *Trademark Infringement Claims*

A. *Trademark Classifications—Degree of Protection*

Before reaching the issue of trademark infringement under both the Lanham Act and the common law, the court must first determine both the validity and strength of the purported trademark. *Callmann, Unfair Competition, Trademarks, and Monopolies* § 84. Invalid or non-distinctive marks are afforded no protection. *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir. 1968). Valid marks are afforded varying degrees of protection in accordance with their strength.

To facilitate the analysis of validity and strength, courts have developed four categories of terms for trademark purposes. Listed in ascending order of strength, the categories are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126 (2d Cir. 1979); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977).

■ A generic term is one which is commonly used as the name or description of a kind of goods. *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11 (2d Cir. 1975). Such a term can be afforded no trademark protection. *Id.; Skinner Mfg. Co. v. Kellogg Sales Co.*, 143 F.2d 895 (8th Cir. 1944). A descriptive term is one which conveys an immediate idea of the ingredients, qualities, or characteristics of the goods. Such a term is entitled to trademark protection only if it has acquired secondary meaning.[5] *Callmann, Unfair Competition, Trademarks, and Monopolies*, § 77.-4; *Stix Products, Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479 (S.D.N.Y.

---

**4.** Lion Rock Trading Co. is also a wholly-owned subsidiary of Mego International.

**5.** Secondary meaning exists when the public interprets a mark to be not only an identifica-

tion of the product, but also a representation of the product's origin. Secondary meaning is generally established by extensive advertising. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir. 1978).

1968). Suggestive terms fall in between the merely descriptive category and the arbitrary and fanciful category—that is, such terms are neither exactly descriptive nor exactly arbitrary and fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976). Such terms are entitled to trademark protection without proof of secondary meaning. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). Arbitrary and fanciful terms are those which have no relation to the nature of the product. Such terms are afforded the strongest trademark protection. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126 (2d Cir. 1979).

■ Registration of a trademark by the Patent and Trademark Office is "prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate. . . ." 15 U.S.C. § 1057(b). However, registration does not assure the protection of a trademark in an infringement action. *National Automobile Club v. National Auto Club, Inc.*, 365 F.Supp. 879 (S.D.N.Y.1973), *aff'd*, 502 F.2d 1162 (2d Cir. 1974).

## 1. *Plaintiff's Micro Armour*

Scott testified that he chose the name Micro Armour for one line of his products because the name suggested the content of the line. There is no question that the name accurately describes many of the items in this line, *i. e.*, those items which are 1:285 scale replicas of tanks and other armored vehicles. The line includes other items such as helicopters and infantry that traditionally have not been described as armor in themselves (but may be part of armored military units).

The evidence at trial established that the term Micro Armour has become generic. A mark which was distinctive when adopted may lose its distinctiveness and, in effect, degenerate into a generic mark which is not entitled to protection. *Callmann, Unfair Competition, Trademarks, and Monopolies* § 74.2; *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976); *Dupont Cellophane Co., Inc. v. Waxed Prod-*

*ucts Co., Inc.*, 85 F.2d 75, 30 USPQ 332 (2d Cir.), *cert. denied*, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936).

■ The principal factor to weigh when determining whether a mark is generic is the public's reaction to that mark. *Callmann, Unfair Competition, Trademarks, and Monopolies* § 74.2. The evidence established that the purchasing public uses the term micro armour, or some variant spelling, in a generic sense to mean military miniatures (of a 1:285 or similar scale) used in wargaming, including traditional armor and also associated infantry, guns, etc.

■ Evidence of this generic use is most apparent in the "Intelligence Report" section of *Wargamer's Digest*, a periodical whose readership largely consists of experienced wargamers, the principal purchasers of Scott's products. The Intelligence Report section, which is subtitled "Wargamer's Club News," appears in every issue and contains hundreds of announcements of clubs from all over the United States and Canada. The announcements contain meeting dates and indications of the special interests of club members. An announcement may, for example, solicit new members interested in playing games centered around battles of certain eras, including Ancient and Medieval, Napoleonic, Civil War, World War II, and contemporary, or games using miniatures from various eras.

Many of the announcements concerning play with miniatures indicate that the members play wargames with "micro armor," "Micro-armour," "Micro-armor," "Micro-Armor," "Micro-Scale Armor," "micro scale armor," and variations on the same theme. After evidence of hundreds of such notices was introduced, Scott testified that in his opinion, all but one use referred to his product Micro Armour. He admitted only that one use was generic (an announcement that described the club members' primary interest as wargaming with "Micro-Armor 1/285th 1/300th scale"; Scott does not produce miniatures of a 1:300 scale). However, the club announcements use the micro armour term with various spelling and capitalization, and they consistently use generic

terms to refer to certain types of games or miniatures such as ancient or fantasy, often capitalizing the word.

In addition to the generic use by consumers in the Intelligence Report section of *Wargamer's Digest*, there was other evidence of the generic nature of the Micro Armour name. Scott himself used the term generically on the back of an early packaging by indicating that "GHQ Micro-Armour is the only original micro-armour." Articles in magazines have used the term generically, and experienced wargamers testified regarding the generic use of the micro armour term.

■ Moreover, even if the name Micro Armour had not become generic, Scott could not succeed on his claims that his mark Micro Armour has been infringed. The evidence clearly established that the name is at least descriptive. Descriptive marks are not entitled to protection without proof of secondary meaning, and Scott has not shown that the public considers Micro Armour to represent the product's origin. On the contrary, the evidence shows that the public considers the term to identify military miniatures of a 1:285 or similar scale, regardless of origin. Since the plaintiff has not shown that Micro Armour has acquired secondary meaning, he cannot prevail on his claims that Micro-Armour has been infringed.[6]

### 2. *Plaintiff's Micro Nauts*

Scott testified that he chose the name Micro Nauts for his line of small scale replicas of ships because it suggests what the product is—"Micro" means small, and "Nauts" is an abbreviation of nautical. Scott also testified that he chose the name so that it would be associated with the Micro Armour line of products.

Comparing the components of the name to the product, it would be reasonable to conclude that the term Micro Nauts is descriptive—that it does, in fact, describe a line of miniature ships. If it were deemed descriptive, plaintiff would not be entitled to trademark protection because he has not proven secondary meaning for his mark Micro Nauts.

However, Mego's independent choice of the same words with an astronaut in mind demonstrates that Scott's use of the term Micro Nauts should more properly be characterized as suggestive and therefore entitled to trademark protection if infringed. Thus, it must be determined whether Mego's use of the term Micronauts for its line of toys infringed on Scott's trademark Micro Nauts.

### B. *Likelihood of Confusion*

The basic issue in a trademark infringement action under both the Lanham Act and the common law is whether "consumers are likely to be confused or deceived by defendant's use of a mark similar to that of plaintiff's." *J. C. Penney Company, Inc. v. Artic Enterprises, Inc.*, 375 F.Supp. 913 (D.Minn.1974). *See also Water Gremlin Co. v. Ideal Fishing Float Co., Inc.*, 401 F.Supp. 809 (D.Minn.1975); *Callmann, Unfair Competition, Trademarks, and Monopolies* § 80.

■ The principal focus in analysis of the likelihood of confusion is whether the consuming public is likely to be confused as to the origin or sponsorship of goods. *Sears, Roebuck & Co. v. Johnson*, 219 F.2d 590 (3d Cir. 1955). The following factors must be considered in determining the likelihood of confusion: (1) the strength of plaintiff's designation, (2) the degree of similarity between the plaintiff's and defendant's marks, (3) the relative nature of products involved, (4) the marketing of the

---

**6.** Plaintiff has claimed that Mego's use of the Micronauts trademark harmed not only his Micro Nauts line, but also his Micro Armour line. This claim appears to be based on the "family of marks" theory in trademark law. A family of marks exists when one common family characteristic appears as part of all the marks used, and the owner has sufficiently advertised or promoted the marks to establish, in the minds of the public or the trade, a recognition that he possesses a "family of marks" identified by the common characteristic. *Callmann, Unfair Competition, Trademarks, and Monopolies* § 82.1(f). Even if the plaintiff's Micro Armour mark were not generic, plaintiff would not be entitled to recovery on the family of marks theory. Many items on the market use the prefix "micro," and it was not established that the plaintiff's use of two names with the micro prefix was a "family of marks."

products, including the manner in which the products, are provided, and their respective trade channels, (5) the degree of care likely to be employed by consumers due to the price and other characteristics of the products, (6) the frequency and casualness of the purchase, and (7) whether defendant is deliberately trafficking in the plaintiff's mark. *J. C. Penney Company, Inc. v. Artic Enterprises, Inc.*, 375 F.Supp. 913 (D.Minn. 1974). *See also Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167 (2d Cir. 1976); *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44 (5th Cir. 1975); *Polaroid Corporation v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961). An application of these factors to this case results in the conclusion that there is no likelihood of confusion because of Mego's use of the trademark Micronauts, and therefore Scott's trademark Micro Nauts has not been infringed.

### 1. *Strength of the Mark*

As discussed previously, the degree of protection to be afforded a trademark is partly a function of the strength of the mark—the weaker the mark, the less protection it will be afforded. *See, e. g., Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857 (5th Cir. 1967). The term Micro Nauts, as applied to Scott's miniature ships, has both descriptive and suggestive aspects. Although the court has deemed Scott's trademark Micro Nauts to be suggestive rather than descriptive, the court nevertheless does not consider the mark to be strong. The evidence demonstrated that many items in the leisure class[7] use the prefix "Micro." Because the mark is a weak one, it cannot be afforded the strongest trademark protection.

### 2. *The Degree of Similarity Between the Marks*

Although Scott's trademark Micro Nauts is two words, and Mego's trademark Micro-

nauts is one word, the terms are composed of the same letters and are phonetically identical.

However, the marks appear differently on the respective packaging of the products, and it does not appear from the packaging that the source of origin is the same.

The Mego packaging can accurately be described as "slick,"—it is multi-colored, contains photographs, and is designed to encourage impulse purchases. The trademark Micronauts appears on each of the packages, most often in yellow letters. The Mego logo is also on each package.

Scott's packaging, on the other hand, is simpler. The blister packages in which the GHQ Micro Nauts are contained are light blue with black and white lettering.[8] The letters GHQ appear on the front of the package before the words Micro Nauts. The address of GHQ Micro Armour appears on the back of the Micro Nauts package.

### 3. *Relative Nature of the Products*

Beyond the fact that both product lines in question may be classified as leisure items, they have little in common. Mego's Micronauts are toys, and Scott's Micro Nauts are hobby items. The products are used by different groups of purchasers for entirely different purposes.

Although Scott's products may be of interest to collectors or to those interested in more generalized "adventure" gaming, there is no question that they are principally used in the hobby or wargaming. An early catalog of GHQ, issued before GHQ began the Micro Nauts line, indicated that the military miniatures products of GHQ "are not toys in any sense of the word." The notion that the products were not toys continued after the introduction of the Mi-

---

**7.** Both the plaintiff's and defendants' marks were registered in Class 28, which the Patent and Trademark Office has designated for leisure items. Leisure items include both hobby products and toys.

**8.** After the institution of this lawsuit and shortly before trial, Scott planned a new packaging that more closely resembles that of Mego. The new packaging, which is multi-colored and more eye appealing, was not in use at the time of trial or at the time Mego discontinued the sale of its Micronauts line.

cro Nauts line. The original Micro Nauts packaging contained the following language:

> These fine miniatures are made specifically for wargaming.... ·
>
> Micro Nauts are another successful effort by GHQ to bring vital realism to the military/wargaming hobby.

Wargaming is a specialized hobby whose participants are generally in their late teens or older. Although it is possible to find wargamers as young as 12, they are the exception rather than the rule. Wargames generally have complex sets of rules, and their play requires patience and intelligence. The typical wargamer also has an interest in history and world affairs. James Dunnigan, the designer of hundreds of wargames and recognized expert in the field, described wargaming as "the hobby of the over-educated."

Within the general hobby of wargaming, itself a specialized hobby field, are several sub-interest specialties. One such sub-interest is wargaming with miniatures such as those produced by the plaintiff. Although Scott testified that military miniatures are often used to replace cardboard counters in board wargames, testimony of other wargaming experts indicated that this use of miniatures is very limited because such substitution is costly and impractical[9] and that military miniatures are more advantageously used in non-board wargames. Another sub-interest is naval wargaming which centers around reenactment and play of naval battles.

Scott's Micro Nauts are clearly a specialized hobby product. Their principal appeal is to a very narrow and specialized class of purchasers—wargamers who play naval wargames with miniatures.[10] Naval games are less popular than land wargames, and the World War II period is more popular with wargamers than the Napoleonic era which the Micro Nauts line featured until World War II ships were added recently.

In contrast to the very specialized nature of Scott's Micro Nauts, Mego's Micronauts are toys that are designed to appeal to children ages 6 to 11. The toys did, in fact, have a large appeal as evidenced by the gross sales figures. During the three years in which Micronauts were on the market, retail sales totalled approximately $140 million.

The distinction between the nature of plaintiff's and defendants' products is further illustrated by the results of a consumer survey conducted at Mego's request to determine the likelihood of confusion by purchasers regarding Micronauts and Micro Nauts. The survey was designed, supervised, and analyzed by John Bunge, an expert in the field of marketing research. Although plaintiff attacked the design of the survey, as well as the conclusions drawn by Bunge, the court is satisfied that the survey was not technically deficient and that consideration may properly be given to its results. The population of the sample consisted of people familiar with toy and hobby items. More than 90 percent of the people surveyed identified Scott's Micro Nauts as hobby items; more than 80 percent identified Mego's products as toy items. In Bunge's opinion the survey demonstrated very little, if any, likelihood of confusion, especially as to the source of origin.[11]

---

**9.** Often the military miniatures are larger than the cardboard counters and do not readily fit within the grids of the boards. Furthermore, play becomes more difficult because the miniatures do not contain the information often printed on the counters indicating the strength of the unit, range and fire power, etc.

**10.** Where goods are not purchased on the reputation of the trademark, customers are not deceived by any trademark similarity. This may occur when the name is known only to a relatively small or select group and not to the general public, or when a word is used only together with other identifying marks. *Call-*

mann, *Unfair Competition, Trademarks, and Monopolies* § 81.2(b). Both situations are present here—the names of plaintiff's products are known to a narrow class, and the word GHQ appears with the Micro Nauts and Micro Armour names on packages and in advertisements.

**11.** Bunge testified that only 6 percent indicated a likelihood of confusion (plaintiff's expert witness, Dr. Milo Brekke, was mistaken in concluding that the survey demonstrated that 84 percent of the sample was likely to be confused; he incorrectly equated a lack of knowl-

Scott's and Mego's products are not in competition. Although trademark protection may extend to noncompeting goods in some circumstances,[12] that rule does not result in a finding of trademark infringement here. In order to find trademark infringement, there must exist some likelihood of confusion. Trademark protection for weak marks may be limited to similar goods similarly situated, and only a strong mark is protected against any possible infringement arising out of its use in noncompeting goods. *Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir. 1968); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1230 (3d Cir. 1978); *Callmann, Unfair Competition, Trademarks, and Monopolies* § 82.1. There is no likelihood of confusion as to noncompeting goods if they are unrelated, and if the prior user would not be expected to enter the same market or deal with the same goods as the subsequent user. In the situation before the court, neither the purchasing public nor the trade would expect that the products of the prior and subsequent users originate from the same source. *See Waples-Platter Cos. v. General Foods Corp.*, 439 F.Supp. 551 (N.D.Tex.1977).

Scott argues that because of the increasing popularity of wargaming and adventure gaming, wargames and miniatures are expanding beyond the specialized hobby store into the general toy and hobby market. He urges that Mego's use of the trademark Micronauts has precluded his growth in that market. The evidence, however, did not support this theory.

Although there was evidence that some wargames have been sold in more generalized stores, the evidence would not support a conclusion that either those games or Scott's products have entered or would have entered the same or even similar market as Mego. Wargaming is a specialized hobby that appeals to a very narrow class of customers, and an even narrower class of customers are interested in miniatures. When wargames are sold in more generalized stores, as opposed to specialty hobby stores, they are displayed in the hobby or gaming section, rather than with toys such as Mego's Micronauts. The evidence clearly would not support a conclusion that wargaming products in general, or Scott's products in particular, would enter a market that would include children ages 6 to 11, the market at which Mego's Micronauts were directed.

The evidence did not support Scott's attempt to link his products to fantasy and adventure gaming, a type of play that appeals to a larger and younger market than the historical military wargaming market. The evidence, including the testimony of wargaming expert James Dunnigan, established that the use of realistic military miniatures with fantasy games, is extremely rare, if it exists at all.

Furthermore, the plaintiff was unable to substantiate his claim that Mego's use of the Micronauts trademark harmed his business. He argued, for example, that 1978, the first full year that Mego's Micronauts were in the general market, was the only year in which GHQ had a decline in sales. The evidence, however, demonstrated that this loss in sales was the result of factors independent of Mego's presence in the toy market. There was an increase in competition in the military miniatures market in 1978, including the presence of C in C, a company whose products are of comparable quality to Scott's and whose prices were lower than Scott's in 1978. In addition to increased competition, Scott lost a major distributor and an experienced sales representative in 1978.

### 4. Marketing of the Products

#### (a) Channels of Trade

Mego marketed its Micronauts line through distributors and direct sales to stores. The toys were sold in a variety of

---

edge of the manufacturer with the likelihood of confusion). The 6 percent survey figure does not, of course, require the conclusion that there is a likelihood of confusion in the actual marketplace or among actual purchasers.

12. *AMP Inc. v. Foy*, 540 F.2d 1181 (4th Cir. 1976); *Allstate Ins. Co. v. Allstate Inc. Co.*, 307 F.Supp. 1161 (N.D.Tex.1969).

types of stores, including discount retail stores, department stores, and toy stores.

Some of Scott's business is conducted by direct mail order—that is, the consumer buys directly from GHQ. Most of the business, however, is conducted through distributors who sell to stores that in turn sell to the ultimate consumer. The vast percentage of stores that carry Scott's products are either wargame specialty ("buff" shops) or hobby stores. There was testimony that a few stores with large hobby or game departments also carry Scott's products. When his products are sold in these stores, however, they are in the hobby or game department rather than the toy section.

There was some testimony that products similar to those of Scott's are sold in toy and hobby stores. Heritage and Valiant products, for example, but not those of Scott, were displayed for sale in the Kids store in Minneapolis.[13] The Minneapolis store sells toys, including Mego's Micronauts when they were on the market, and games, including some war and adventure games. The fact that Heritage products are sold in such a store is of only limited probative value in determining Scott's actual market, however. As evidenced by the testimony of James Oden, the former president of Heritage Models, Inc., the marketing techniques of Heritage have been significantly different than those of GHQ.[14]

Furthermore, expert testimony revealed that the trade channels for the parties' products are quite different. Bernard Paul, a hobby distributor and an expert in the industry, who formerly headed the Hobby Industry of America Association, and Nathan Polk, who has been described as the "great grandfather of the hobby business," testified that Scott's products are specialized hobby items and that they cannot be marketed as toys.

(b) *Advertising*

(1) *Scott*

Scott testified that 20 percent of his advertising budget is directed to the purchasing public, and 80 percent is directed to the trade. The trade advertising appears in such periodicals as *Model Retailer*, a trade magazine for the hobby industry. The plaintiff also sends press releases to other trade periodicals such as *Playthings* and *Toy and Hobby World*, but does not advertise in those periodicals. Prior to the institution of this lawsuit, plaintiff's consumer advertising had been restricted to periodicals specifically directed to wargamers such as *Wargamer's Digest, Courier*, and *AFV–G2*.

In 1978 and 1979, well after this lawsuit began, Scott placed three advertisements in *Boys' Life*, a periodical of more general distribution. The GHQ advertisement in the July, 1978 and July, 1979 issues of *Boy's Life* was entitled "WARGAME TANKS." Readers were invited to send in $1.00 (July, 1978 advertisement) or $2.00 (July, 1979 advertisement) for a catalog and a sample tank. There were approximately 2,900 responses to these two advertisements. In addition to a GHQ tank and catalog, respondents were sent a letter telling them that if they sent in the name of their favorite Micro Naut along with $2.00, "we will send your favorite Micro Naut to you—*no matter what the regular price is.*" (emphasis in original).[15] Of the approximately 2,900 people who received this letter, 6 or 7 sent in requests for Mego Micronauts.

The November, 1978 issue of *Boys Life* carried a GHQ advertisement entitled

---

**13.** Scott testified that he sold his products through another Kids store somewhere in the East.

**14.** Unlike GHQ, Heritage Models marketed games, as well as miniatures, and displayed at the New York Toy Fair on a regular basis. Furthermore, Heritage had more direct contact with retail stores via a traveling salesman and expended substantially more in advertising, both trade and consumer, than GHQ.

**15.** Scott testified that his Micro Armour products, most often packaged with 5 units in a pack, sold at retail for $.80 per individual unit. The retail price for his Micro Nauts ranged from $2.00 to $6.50, with 1 or 2 units per pack. The suggested retail price for Mego Micronauts ranged from $1.49 to $29.95.

"Wargame with Micro Nauts." The advertisement invited readers to "clip the Micro Naut name from our package and send it to us. We'll send you our free brochure on how to wargame with these exciting miniatures." It is not known how many responses there were to this advertisement because Scott testified that he did not keep those that clearly referred to his own products. Approximately 150 requests for the free brochure, accompanied by a clipping from Mego Micronauts packages, were received into evidence.

■■■ In the usual situation, evidence of actual confusion is highly probative in a trademark infringement case. *Waples-Platter Cos. v. General Foods Corp.*, 439 F.Supp. 551, 582 (N.D.Tex.1977); *Callmann, Unfair Competition, Trademarks, and Monopolies* § 80.6. This is not the usual situation, however. The confusion shown in the responses to the *Boys' Life* advertisements did not occur under normal market conditions. The evidence in this case, including an examination of the past advertising and sales history of the plaintiff, the advertisements themselves, and the letters sent to respondents, strongly suggests that the advertisements were placed with the primary purpose of obtaining evidence of confusion for this litigation, rather than engendering sales.

The *Boys' Life* advertisements were the first and only consumer advertisements placed in a non-wargaming magazine—that is, a periodical of more general readership. At the time the advertisements ran, GHQ had only limited exposure to the public, especially compared to Mego Micronauts. Volume sales of Scott's products were small, and his Micro Nauts were available only by mail order or in specialty wargame

or hobby shops and departments that carried military miniatures. Consequently, the public to whom the advertisements were addressed, *i. e.*, the readership of *Boys' Life*, was largely ignorant of Scott's products, particularly Micro Nauts.[16] It could be expected that when invited to send in the name of "their favorite Micro Naut," a large number of respondents would refer to a Mego product. Given these circumstances, the confusion shown in the responses is not probative of confusion in the actual marketplace.

### (2) *Mego*

In contrast to the emphasis on the wargaming hobby in Scott's advertising, Mego advertised its Micronauts products as toys. During the time that its Micronauts were on the market, Mego expended approximately $10 million for local and national television advertising, geared at children ages 6 to 11 and adults who might buy the toys for children. In addition to the television advertising, there was some advertisement of Mego Micronauts in trade journals. Prior to the actual introduction of the Mego Micronauts line, Mego carried advertisements in trade journals announcing that "Micronauts are Coming." In contrast to the emphasis of Scott's advertising, Mego's Micronauts advertisements were directed to a general audience of children and adults who might purchase toys for children.

### 5. *Degree of Care Exercised by Consumer*

■■■ Testimony of experienced wargamers and proprietors of stores selling wargame items established that wargamers are sophisticated purchasers who generally know what they want before they enter the stores.[17] Given the specialized nature of

---

16. Scott's Micro Nauts had had little exposure to the public. This line had been on the market for a shorter time than Micro Armour, and its appeal was to a specialized class of wargamers who played Napoleonic naval battles with miniatures, a much narrower class than the already narrow class of purchasers of the Micro Armour line.

17. In determining the likelihood of confusion, the court should consider the general impression of the ordinary purchaser, buying under

the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods. The ordinary purchaser, however, differs according to the "character of the article, the use to which it is put, the kind of people who ask for it, and the manner in which it was ordered." *Callmann, Unfair Competition, Trademarks, and Monopolies* § 81.2(a). *See also David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377 (8th Cir. 1965).

the hobby, this consumer sophistication is not surprising. Participants in the hobby are often well-versed in world history, particularly military history. They read magazines geared specifically to wargaming such as *Wargamer's Digest* and *Strategy and Tactics*, which contain articles on wargaming, including detailed descriptions of specific battles, and which may publish new games, that is, the rules for a newly-conceived wargame, such as those designed by James Dunnigan for *Strategy and Tactics*. The general knowledge of history, and specific knowledge of actual battles, enables wargamers who play with military miniatures to know what equipment they may need for the play of specific games. These magazines also may serve to bring together gamers interested in a particular type of play or wargame.

Another indication of the sophistication of the purchasers of Scott's products are the detailed assembly instructions enclosed in each Micro Nauts package. The instructions include reference to nautical terminology such as "mizzen mast," "spankar," "yardarm," "sprityards," and "dolphin strikers." Complete assembly requires the use of glue and a drill capable of drilling holes .015 inches. The instructions also include information regarding the colors that various parts of the Micro Naut can be painted.

Dr. Robert A. Strom, a leading expert on child development and learning theory, testified about the assembly of a GHQ Micro Naut. His testimony was based upon his knowledge of the stages of child development and upon a study he conducted of ten boys, ages 13–17, who were asked to assemble a Micro Naut. The boys chosen for the study had previous model assembly experience and were considered high achievers. Dr. Strom concluded that to assemble a GHQ Micro Naut according to the instructions provided by the plaintiff, a child would have to be in the formal operational stage of development,[18] a stage which is not reached until age 11 at the earliest, but most often not until age 15. Dr. Strom's

testimony supports the conclusion that the market for Scott's and Mego's products is not the same.

In contrast to Scott's products, Mego Micronauts were impulse items which required no sophistication on the part of the purchaser. The flashy advertising and packaging was designed to encourage impulse or non-deliberative purchasing by children ages 6 to 11, or adults buying for such children. Mego's Micronauts are used by children who engage in play. No knowledge or interest in history is required, and although minimal assembly is required for some Micronauts, that assembly does not require special knowledge or skill.

### 6. *Frequency and Casualness of the Purchase*

As already discussed, purchasers of Scott's products are sophisticated consumers who have a knowledge and interest in history and who generally know what they want before they enter the store. They cannot be classified as casual purchasers. Mego's products, on the other hand, are designed to be impulse items that require no special knowledge or interest on the part of the purchaser or user.

Frequency of purchase is of little relevance here since given the nature of both Scott's and Mego's products, neither is likely to wear out and require a replacement purchase. Thus, depending on the consumer's interest in obtaining a variety of products in the respective lines, purchases might be frequent or infrequent.

### 7. *Mego's Intent*

■ Although intent is not an element of trademark infringement, intent to pass off goods as the product of another "raises an inference of likelihood of confusion." *Squirtco v. The Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980). The evidence in this case establishes that Mego's use of its Micronauts mark was not due to any intent to infringe Scott's mark or any desire to

---

**18.** Dr. Strom testified that certain necessary skills and concepts are not mastered until a child reaches this stage. Those skills and concepts include proportion and scaling, and an appreciation of historical time.

pass its goods off as those of Scott or to deliberately traffic in Scott's marks.

 Mego was not even aware of Scott's use of the Micro Nauts name until February, 1977. By that time, Mego had negotiated with Takara Co., Ltd., for the purpose of the line of toys, had conducted a trademark search which did not show a registration or pending application for Micronauts or Micro Nauts, had adopted the Micronauts trademark and established use of the mark in interstate commerce,[19] and had filed an application to register the mark. Although no commercial sales were made until the spring of 1977, Mego had laid the groundwork for those sales well in advance of becoming aware of Scott's mark Micro Nauts. It had already begun the manufacturing process of the toys and initiated package design and production and an advertising campaign. It had expended considerable time, effort, and money.

When Scott became aware of Mego's Micronauts mark, he and his counsel contacted Mego and its attorneys. The correspondence between counsel indicates that there was some discussion of an amicable solution, including possible purchase by Mego of Scott's mark, but that they disagreed as to the effect of Mego's mark on Scott's marks. Scott insisted that Mego's use of its mark constituted trademark infringement, which Mego denied.

Given the very different nature of the products and their respective markets, it was not unreasonable for Mego to assume that there would be no likelihood of confusion by its use of the Micronauts mark and that there was consequently no infringement. Mego was aware that Scott's business was small and that his products appealed to a narrow class of customers, a class significantly different from Mego's customers. The annual volume of Scott's sales was generally in five figures, and he has never penetrated a large general market for his products.

Mego's use of the Micronauts mark was not done with an intent to traffic in Scott's market, to infringe his trademarks, to confuse the trade or public, or to exploit any good will associated with Scott's mark to its own benefit.

### 8. *Summary*

 The court concludes from all the evidence in the record that there is no likelihood of confusion resulting from Mego's use of the trademark Micronauts. The court had the opportunity of observing the manner and demeanor of the witnesses who testified at the trial and was in a position to evaluate their relative credibility. Scott is an intelligent and articulate man whose testimony was sometimes evasive and equivocating, as well as self-serving. The alleged instances of confusion advanced by the plaintiff do not support a finding of trademark infringement.[20] Rather, the evidence revealed that the products of the respective parties are of a different nature, directed to different target markets, and that there is no likelihood of confusion.

This conclusion is further supported by the registration of both Scott's and Mego's marks. The Patent and Trademark Office is barred from registering confusingly similar marks. 15 U.S.C. § 1052(d) provides that:

**19.** In order to create a right to a trademark, the owner must use the mark in commerce. *Flavor Corp. of America v. Kemin Industries, Inc.*, 493 F.2d 275 (8th Cir. 1974). In June, 1976, Mego mailed a shipment of Micronaut toys to a manufacturer's representative in California. The label indicated that the enclosed items were Micronauts, a product of Mego Corp. In the fall of 1976, products bearing the name Micronauts were shown to primary national customers of Mego, and orders were taken for later shipment. These uses of the Micronauts name indicated Mego's adoption of the trademark and its continuing intent to engage in commercial use of the mark, and they were sufficient to constitute use in commerce. *Electronic Com'ns, Inc. v. Electronic Components for Inc. Co.*, 443 F.2d 487 (8th Cir. 1971).

**20.** In addition to the *Boys' Life* evidence, several other instances of alleged confusion were the subject of testimony. Scott testified that he received a few telephone requests for products of Mego. Lorraine Scott, the plaintiff's wife, testified that shortly after advertisements for Mego Micronauts appeared, she received a telephone call inquiring whether GHQ had been sold. A proprietor of a specialized hobby store testified that it was reported to him that several customers had asked for products of Mego.

§ 1052 *Trademarks registrable on principal register; concurrent registration*

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

. . . . .

(d) Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive. . . .

The trademark applications for the plaintiff's Micro Nauts and the defendants' Micronauts were reviewed by the same trademark examiner who recommended that both applications be approved. John Merchant, former director of the United States Trademark Office, testified that when reviewing applications to register a trademark, the trademark examiner considers the class of buyers that are the target of the products. When the marks themselves are similar, differentiation in goods can be very significant. Merchant testified that registration is refused on similar marks only if a likelihood of confusion would result from concurrent use of the marks.

Since there is no likelihood of confusion resulting from the defendants' use of the Micronauts trademark, the plaintiff cannot prevail on his claims for statutory and common law trademark infringement of his mark Micro Nauts.[21]

## IV. Plaintiff's Remaining Claims

In addition to alleging common law and statutory infringements of its trademarks, plaintiff also alleges that defendants' use of the trademark Micronauts constitutes a false designation of origin and a false description and representation in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), that defendants have violated the Minnesota Deceptive Trade Practices Act, and that the defendants' trademark will dilute the distinctiveness of the plaintiff's trademarks.

### A. False Designation of Origin Claim

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) imposes civil liability upon "(a)ny person who shall . . . use in connection with any goods . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same."

■■■■■ A cause of action arises under this section when a mark used in interstate commerce is likely to cause confusion, or to deceive purchasers into believing that the source of origin of goods is another person or company. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980); *Nature's Bounty, Inc. v. SuperX Drug Corp.*, 490 F.Supp. 50 (E.D.N.Y.1980); *Clarks of England, Inc. v. Glen Shoe Co.*, 485 F.Supp. 375 (S.D.N.Y.1980); *Callmann, Unfair Competition, Trademarks, and Monopolies* § 18.-2(b). "Thus, the prime test of liability under § 43(a) is closely analogous to, if not identical with, the likelihood-of-confusion test of federal and common-law trademark infringement and unfair competition."

**21.** Plaintiff also argues that this case presents a situation similar to that in *Big O Tire Dealers v. Goodyear Tire and Rubber Co.*, 561 F.2d 1365 (10th Cir. 1977). The court in that case described the principal issue as "reverse confusion"—where the second user's use of the plaintiff's mark results in confusion as to the origin of plaintiff's products. *Compare Westward Coach Manufacturing Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir. 1968) (the court held that "reverse confusion" is not actionable as a trademark infringement). This contrasts from the typical trademark infringement situation in which the plaintiff seeks recovery from the loss of income resulting from a second user's attempt to trade on the goodwill associated with the first user's mark and the suggestion to the public that his mark comes from the same origin.

Even if reverse confusion were considered to be an actionable theory in this circuit, it has not been established on this record. The evidence did not show that there is a likelihood of an assumption on the part of the consuming public or trade that the plaintiff's products originate with Mego.

*Black Hills Jewelry Mfg. v. Gold Rush, Inc.,* 633 F.2d 746, 753 n. 7 (8th Cir. 1980), quoting *J. McCarthy, Trademarks and Unfair Competition* § 27.5A at 250–51 (footnotes omitted).

Because the plaintiff has not shown a likelihood of confusion resulting from defendants' use of the Micronauts trademark, his cause of action under section 43(a) of the Lanham Act fails.

**B. *Minnesota Deceptive Trade Practices Act***

Scott also alleges that Mego's use of the trademark Micronauts violated the Minnesota Deceptive Trade Practices Act [22] in that (a) it is likely to cause confusion and misunderstanding as to the source, sponsorship, or approval of their products, and (b) it will disparage the goods and business of plaintiff by the false or misleading representation of fact that plaintiff's products are manufactured by the defendants.

The claim under the Minnesota Deceptive Trade Practices Act is substantially the same as the federal claims. The relevant portion of the Act provides as follows:

325D.44 *Deceptive trade practices*

Subdivision 1. A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services,

(3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

. . . . .

(8) disparages the goods, services, or business of another by false or misleading representation of fact;

. . . . .

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

Subd. 2. In order to prevail in an action under sections 325D.43 to 325D.48, a complaint need not prove competition between the parties or actual confusion or misunderstanding.

In order to make out a claim under the Act, the plaintiff must show some likelihood of confusion or misunderstanding, the same element that must be shown to prevail on a claim of common law or statutory trademark infringement. As discussed previously, Scott has not shown that element.

Nor has Scott demonstrated any other possible basis for a claim under the Minnesota Deceptive Trade Practices Act. There was no evidence that Mego passed off its goods as those of Scott. Furthermore, the evidence did not establish that Mego engaged in any deception or made any false or misleading representation of fact that would disparage the goods, service, or business of Scott. Mego adopted the Micronauts trademark without any knowledge of Scott's Micro Nauts trademark. Mego's advertising for Micronauts contained references to the Mego name, and each package contained the Mego logo.

**C. *Trademark Dilution Claim***

Scott alleges that defendants' use of the trademark Micronauts will dilute the distinctiveness of his trademarks Micro Nauts and Micro Armour, tarnish the affirmative association that his marks enjoy, as well as his reputation, and destroy the advertising value of his marks.

Unlike Scott's other causes of action, confusion or the likelihood of confusion is not a necessary premise to an action for trademark dilution. *Holiday Inns, Inc. v. Holiday Out in America,* 481 F.2d 445 (5th Cir. 1973). *Callmann, Unfair Competition, Trademarks, and Monopolies* § 84.2. Dilution occurs when the use of a mark similar to the plaintiff's has an adverse effect on the value of plaintiff's mark by potentially depriving it of all distinctive-

---

**22.** When this suit was filed, the Minnesota Deceptive Trade Practices Act was designated as Minn.Stat. 325.771, *et seq.* The statutes have since been renumbered and the Act now appears as Minn.Stat. 325D.43, *et seq.*

ness. *Laverne Intern., Ltd. v. American Institute of Interior Designers, Inc.,* 353 F.Supp. 659 (S.D.N.Y.1973). The cause of action is described in *Wells Fargo & Co. v. Wells Fargo Express Co.*:

> The gravamen of a dilution complaint is that the continuing use of a mark similar to the plaintiff's will inexorably have an adverse effect upon the value of the plaintiff's mark, and that, if he is powerless to prevent such use, the plaintiff's mark will eventually be deprived of all distinctiveness. Dilution is an act which "threatens two separable but related components of advertising value. Junior users may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey.

358 F.Supp. 1065, 1088 (D.Nev.1973), quoting *Callmann, Unfair Competition, Trademarks, and Monopolies* § 84.2.

■ In order to make out a claim for trademark dilution, the plaintiff must show that its trademark is distinctive. The distinctiveness may be the result of the mark's extraordinary uniqueness or a considerable advertising effort. *Callmann, Unfair Competition, Trademarks, and Monopolies* § 84.-2.

■ As discussed previously, the term Micro Armour is not distinctive and is entitled to no trademark protection. Because it is not distinctive, Scott's dilution cause of action as it relates to Micro Armour fails.

Scott's trademark Micro Nauts, although protectible as a trademark, is not a strong mark. There are many other trademarks in the leisure class with the prefix Micro, and the term Nauts is merely a shortened version of the term nautical. The mark is not extraordinarily unique. Furthermore, there has not been a considerable advertising effort that would cause the public to consider the Micro Nauts trademark to be distinctive. Plaintiff has never advertised widely nor extensively. Advertising of the Micro Nauts line, until this litigation was begun, was directed solely to a very narrow class of purchasers—wargamers who play naval games with military miniatures. The trademark cannot be considered distinctive beyond this narrow class of purchasers. The advertising value to this class of informed purchasers has not been diminished by the adoption of a trademark in a totally unrelated class of goods—children's toys. *See Callmann, Unfair Competition, Trademarks, and Monopolies* § 84.2 ("If plaintiff's mark is neither unique nor popular, and the goods are entirely unrelated to those of defendant, neither dilution nor confusion can reasonably be anticipated.").

Furthermore, Scott has not established that Mego's use of the Micronauts trademark could tarnish the "affirmative associations" that Scott's Micro Nauts mark may convey. The only evidence of any negative association with Mego was a newspaper article reporting that one variety of Mego Micronauts was considered a dangerous toy. There is no reason to believe that this publicity would tarnish any affirmative associations of Scott's products. The article clearly does not relate to the plaintiff's products; the item was identified as a toy, rather than a hobby item for wargamers, and the article also indicated that the product was marketed by Mego in its line of "interchangeable World of the Micronauts."

## V. *Mego's Counterclaims*

Mego urges that both of Scott's trademarks should be removed from the Principal Register of the Patent and Trademark Office: Micro Armour because it is merely descriptive of the goods with which it is associated and Micro Nauts because Scott allegedly perpetrated a fraud on the Patent and Trademark Office in obtaining registration by falsely identifying the nature of the goods on which the mark was used by describing them as "cast metal miniature toys."

Congress has provided two methods for cancellation of a registered trademark. A cancellation proceeding may be initiated under 15 U.S.C. § 1064 by filing a petition to cancel the registration with the Patent and

Trademark Office. Grounds for cancellation provided in this section include fraudulent procurement of the mark and the name's becoming "the common descriptive name of an article or substance." Cancellation may also be sought under 15 U.S.C. § 1119 in any court action where validity of the mark is in issue. Under § 1119 the court "*may* determine the right to registration (and) order the cancellation of registrations . . ." (emphasis added).

In cancellation proceedings before the Patent and Trademark Office the petitioner seeking cancellation of a registered mark must demonstrate that "he is or will be damaged by the registration of a mark. . . ." 15 U.S.C. § 1064. *See Crown Wallcovering Corp. v. Wall Paper Mfgrs. Ltd.*, 188 U.S.P.Q. 141 (TMT & App.Bd. 1975); *Yard-Man, Inc. v. Getz Exterminators, Inc.*, 157 U.S.P.Q. 100 (TMT & App.Bd. 1975).

Although § 1119 has no explicit standing requirement like that of § 1064, claims for cancellation have been dismissed where the claimant has not alleged "the requisite damage to establish its standing to seek cancellation." *Estate of Hoffman v. Nabisco, Inc.*, 444 F.Supp. 106, 109 (S.D.N.Y. 1968). The doctrine of standing requires that a party must itself have suffered an injury in order to seek judicial action. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

▉ The evidence demonstrated that Scott and Mego are not competitors and that there is no likelihood of confusion resulting from the concurrent use of Scott's and Mego's marks on dissimilar products. Mego has not shown that it has been damaged, or could be in the future, by the registration of Scott's marks, nor has Mego

suffered any injury from Scott's use of his registered marks. *Cf. Goheen Corporation v. White Co.*, 126 F.2d 481, 29 CCPA 926 (1942). Since Mego is without standing to seek cancellation of either the Micro Armour or Micro Nauts marks, its counterclaims are dismissed.[23]

### ORDER

Based upon the foregoing, the arguments and memoranda of counsel, all the files, records, and proceedings herein, and the court being fully advised in the premises,

IT IS HEREBY ORDERED THAT:

1. Plaintiff's claims are dismissed, and defendants are entitled to their costs in defending against them.

2. Defendant Mego's counterclaims are dismissed, and plaintiff is entitled to his costs in defending against them.

3. Any claim for attorney's fees herein would have to be filed within 21 days of the date of this order. *See Obin v. District No. 9 of the International Association of Machinists and Aerospace Workers*, No. 80–1315 [651 F.2d 514] (8th Cir. June 11, 1981).

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**23.** Even if Mego had standing to seek cancellation of Scott's Micro Nauts mark, the evidence has not demonstrated that such cancellation should be ordered. 15 U.S.C. § 1064(c) provides that a trademark registration may be cancelled if "its registration was obtained fraudulently . . ." It appears that the description used in the application may well have been chosen to further the plaintiff's position in this litigation. However, even though the description was self-serving and misleading, its use does not appear to be the type of fraud contemplated by 15 U.S.C. § 1064(c). *See Continente v. Continente*, 244 F.Supp. 688 (N.D.Cal.), *aff'd*, 378 F.2d 279 (9th Cir. 1967).