**David J. DeROSIER, individually, and doing business as Michael's, Plaintiff,**

v.

**5931 BUSINESS TRUST, a Delaware business trust and Michaels Stores, Inc., a Delaware corporation, doing business as Michaels, Defendants.**

Civ. No. 5–94–133.

United States District Court, D. Minnesota, Fifth Division.

Dec. 13, 1994.

---

Joseph J. Mihalek, Fryberger Buchanan Smith & Frederick, Duluth, MN, for plaintiff.

Robert H. Magie, Crassweller Magie Andresen Haag & Paciotti, Duluth, MN, Anthony E. Peterman, Baker & Botts, Dallas, TX, for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court upon plaintiff's objections to a Report and Recommendation of United States Magistrate Judge Raymond L. Erickson dated November 9, 1994. Plaintiff objects to Magistrate Judge Erickson's recommendation that his motion for a preliminary injunction be denied.

Based upon a de novo review of the record herein, the court adopts Magistrate Judge Erickson's Report and Recommendation dated November 9, 1994. Accordingly, **IT IS HEREBY ORDERED** that plaintiff's motion for a preliminary injunction is denied.

## FINDINGS AND RECOMMENDATION

[November 9, 1994]

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance

with the provisions of Title 28 U.S.C. § 636(b)(1)(B), upon the Plaintiff's Motion for a Preliminary Injunction which would restrain the Defendants from using the name "Michaels" in connection with any retail store or business, within a 50–mile radius of Duluth, Minnesota, and from using the name "Michaels" in any advertisements, signs, labels or other marketing endeavors or materials, within that same area.

A Hearing on the Motion was conducted on November 2, 1994, at which time the Plaintiff appeared by Joseph J. Mihalek, Esq., and the Defendants appeared by Robert H. Magie, III, Robert M. Chiavello, and Anthony E. Peterman, Esqs.[1]

For reasons which follow, we recommend that the Motion for a Preliminary Injunction be denied.

## II. *Procedural and Factual Background*

■ This action, which was removed from the State District Court in St. Louis County, Minnesota, alleges that the Defendants have violated the Plaintiff's common law trade name, the Lanham Act, the Minnesota Deceptive Trade Practices Act, and the provisions of Minnesota Statutes Section 325D.165, by opening and operating a retail business, in the City of Duluth, under the name of "Michaels." The Defendants deny any violation of law, and maintain that their use of the service mark[2] "Michaels" was authorized by registrations that were properly secured from the United States Patent and Trademark Office.

In support of his Motion, the Plaintiff notes that he has been operating a business in the City of Duluth, which has been engaged in providing services as an art gallery and a framing center since 1979, under the legend of "Michael's Frame & Gallery."[3] Specifically, since he purchased the business from James Michael Porter ("Porter") in 1979, the Plaintiff has sold art work, ready- or custom-made picture frames, and framing materials, at this retail outlet. Prior to the Plaintiff's purchase of the business, Porter had owned and operated the concern since June of 1975, offering the same line of services, but from a different business address. The evidence is not contested, therefore, that the Plaintiff has continuously operated a business, which included the term "Michael's" in its name, since 1979. Nor do the Defendants seriously quarrel with the Plaintiff's representation that his customers extend geographically throughout the Arrowhead Region of Northeastern Minnesota.

1. In addition to the Affidavit evidence that each party has submitted to the Court, both parties called witnesses to testify at the Hearing in this matter. The Plaintiff testified on his own behalf, and the Defendants presented the testimony of Michael Wood, who is the manager of the Defendants' store in Duluth; Mark V. Beasley, who is the Defendants' Vice–President, General Counsel and Secretary; and Stephen C. Yevich, the Defendants' Comptroller. Necessarily, our rendition of the factual background embodies our appraisal of the believability of both the oral and physical or documentary evidence. *Anderson v. Bessemer City,* 470 U.S. 564, 579, 105 S.Ct. 1504, 1514, 84 L.Ed.2d 518 (1985).

2. Technically, distinctions arise in the use of the terms "trade-marks," "trade names," and "service marks." A "trade-mark" includes any word, name, symbol or device which is used by one manufacturer or merchant to distinguish its goods from those manufactured or sold by others. *Title 15 U.S.C. § 1127.* On the other hand, a "trade name" encompasses individual names and firm names that are used by manufacturers and merchants to identify their businesses, *Id.,* while a "service mark" means a mark that is used in the sale or advertising of services in order to distinguish one's services from those provided by another. *Id.* Service marks are registrable, in the same manner and with the same effect as trade-marks and, when registered, are entitled to the protections extended to trademarks. *Title 15 U.S.C. § 1053.* As a consequence, despite the difference in labeling, the central issue in a trade-mark, trade name or service mark case is whether there is a likelihood of confusion. Cf., *Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 579 (2d Cir.1991). Although we use these terms somewhat interchangeably, we do not wish to entirely blur their proper, literal meaning.

3. Since 1980, the Plaintiff has advertised his business in the City Directory for Duluth as "Michael's Frame & Gallery." The signage over the entry of his store reads:

Michaels Framing Center
Art Gallery

In addition, he has submitted written advertisements, as attachments to his Affidavit, which varyingly identify his business as: "Michael's;" "Michael's Framing Art Gallery;" and, "Michael's Framing Gallery."

On the other hand, the Defendants did not open a store, in the market area surrounding Duluth, until the Summer of 1994. Nevertheless, the Defendants are the rightful owners of the service mark "Michaels" ever since the registration of that mark on January 4, 1983, and they have lawfully possessed the right to use the service mark "Michaels," as depicted in a stylized script, since the registration of that mark on December 25, 1984. As to both service marks, the Registrations from the United States Patent and Trademark Office reflect that the mark relates to "Retail Store Services for the Sale of Hobby, Craft and Picture Framing Materials." Currently, the Defendants operate over 375 stores under the "Michaels" service mark in 41 states and in Canada.

Unlike the Plaintiff's merchandizing, the Defendants' business is not confined to the sale of art work and framing services, for they offer an inventory of "over 30,000 items, including a wide selection of general crafts, wearable art, silk and dried flowers, picture framing materials and services, hobby and art supplies, and party, seasonal and holiday merchandise." *Michaels Annual Report 1993.* While, indeed, the Defendants sell paintings—framed and unframed—their art work is not of gallery quality and, generally, retails for less than $250. In contrast, commencing in 1980, the Plaintiff has offered "A 'Peoples Gallery' Specializing in Locally Made Art, Paintings, Sculptures and Photos, A Gift Center for Works of the Northland and Twinports," with some of his paintings retailing for $1,500. See, *Exhibit D to Affidavit of DeRosier dated November 2, 1994.* Instead of fine art, the Defendants offer a wide-variety of hobby and craft materials which, in substantial part, are foreign to the Plaintiff's business.[4]

According to the Plaintiff, approximately 25 percent of his business is derived from the sale of fine art, with the remainder being attributable to the sale of ready- and custom-made frames. In the other extreme, the evidence demonstrates that the sale of frames accounts for a mere 8½ percent of the Defendants' sales proceeds, of which 2% is derived from the sale of custom-made frames.[5] On a national average, the Defendants' stores generally report custom-made sales of 5.3%—or 4.5% for their newly opened retail outlets. As a consequence, the Defendants argue that, at 2%, their store in Duluth is below the national average—a fact that is directly at odds with the Plaintiff's argument that the Defendants are preying upon the Plaintiff's commercial reputation in order to enhance their own sales of framed goods.

On or about August 22, 1994, the Plaintiff was questioned by one of his customers whether he was expanding to a new location at the Village Mall, some four miles distant from his present business address. Upon further investigation, the Plaintiff determined that the Defendants were making their final preparations for the opening of their retail store in Duluth. Subsequently, by letter dated September 27, 1994, counsel for the Plaintiff wrote the Defendants as follows:

It has been brought to our attention that Michaels Stores, Inc. is planning on opening a store under the mark, MICHAELS, for retail store services identical, in large part, to my client's services. Michaels Stores, Inc.'s use of a mark with an identical commercial impression for identical and

4. During his direct-examination, the Plaintiff advised that he had toured the Defendants' newly opened retail outlet in Duluth. Upon cross-examination, the Plaintiff admitted that most of the merchandise that he saw at the Defendants' store is not offered for sale in his own business establishment. As the photographic exhibits depict, and as their witnesses have confirmed, the Defendants offer doll houses, model planes and cars, dried and silk flowers, jewelry making items, gift wrap, ribbons, art supplies, holiday decorations and a wealth of other craft related goods which the Plaintiff does not now, nor has he ever, sold to the public.

In addition, the Defendants offer a variety of instructional materials and seminars in order that their customers may design and assemble a variety of craft creations. No such services are provided by the Plaintiff.

5. Of some 100 sales counters that are located in the Defendants' store, only about six were devoted to the sale of ready-made frames of the general type sold by the Plaintiff. In addition, the Defendants' store has a work area that, apparently, is closed to the public, and is used for the manufacture of custom-made picture frames.

related services constitutes a direct infringement of Mr. DeRosier's trademark rights attained under common law. In fact, my client has already received many phone calls from people who are confused as to the source of services.

\*    \*    \*    \*    \*    \*

**Mr. David J. DeRosier demands that Michaels Stores, Inc. (or any successor in interest, if applicable) immediately cease and desist all use of the mark, MICHAELS, in and around Duluth, Minnesota and northern Minnesota and Wisconsin for identical and related services,** because use of this mark infringes Mr. DeRosier's trademark rights which cover this area. My client considers Michael Stores, Inc.'s infringement to be a very serious matter, and, if necessary, will pursue enforcing his rights to the fullest extent.

[Emphasis in original].

The Plaintiff demanded a response from the Defendants by no later than October 6, 1994.

By letter dated October 11, 1994, Mark V. Beasley ("Beasley"), who is the Defendants' Vice President, General Counsel and Secretary, responded to the Plaintiff's "cease and desist" demand by requesting documentation for certain of the Plaintiff's contentions, including the Plaintiff's entitlement to use "Michael's" as a trade name; the names, addresses and telephone numbers of any persons who have expressed confusion over the parties' respective trade names; and, any documentary support for the expansive marketing area that the Plaintiff was claiming. Beasley denied any "knowing infringement" on the Defendants' part, and he expressed an interest in having the matter resolved "as soon as possible." On the record before us, there is no evidence that the Defendants were aware of the conflicting interest of the Plaintiff in the use of "Michaels" as a service mark, although the Plaintiff contends that the Defendants were negligent in failing to investigate the pre-existence of a competing service mark in the Duluth area. According

to the testimony of Beasley, during his period of employment with the Defendants, some 200 + stores have opened and the claim of the Plaintiff is the first occasion on which the validity of the Defendants' service mark has been challenged.

After the parties failed to connect in several telephone attempts, this action was commenced in State District Court with the filing of the Summons and Verified Complaint, and an Application for a Temporary Restraining Order. By an Order to Show Cause dated October 17, 1994, the State District Court, the Honorable David S. Bouschor presiding, scheduled a Hearing on the Plaintiff's request for injunctive relief to be held on October 21, 1994. Prior to that date, on October 17, 1994, the Defendants removed this matter to this Court based upon diversity of citizenship jurisdiction. *Title 28 U.S.C. § 1332(a)(1).*

As of the date of the Hearing in this matter—some 3½ weeks after the opening of the Defendants' store—the Plaintiff has been unable to verify any loss of sales income which is attributable to the Defendants' alleged infringement of his trade name. Rather, the Plaintiff could assert no more than his impression that the amount of traffic through his store has declined. On the other hand, during the same span of time, the Defendants' store has registered some 27,600 transactions, of which 163 related to the sale of custom-made frames. According to the Plaintiff, there is substantial confusion that has resulted from the opening of the Defendants' store, with customers and delivery persons expressing puzzlement as to the relationship, if any, between the two retail outlets. The Plaintiff testified that he receives five to ten telephone calls per day from customers who, mistakenly, have thought that his store was the one opened by the Defendants, and he has proffered the Affidavits of eight individuals that attest to their confusion which, assertedly, arises from the similarity of the trade name that has been adopted by the Defendants' retail establishment.[6] Upon

6. While not identical, most of the Affidavits report the nature of the Affiant's confusion in the following words:

> Dave DeRosier told me that they did not have anything to do with the store in the Village Mall [i.e., the Defendants' store]. I was surprised to hear this because the name is the

cross-examination, however, the Plaintiff acknowledged that the bulk of the telephone inquiries related to the location of the Defendants' craft and hobby store—inquiries which were generated by the fact that the Defendants' store does not, currently, have a listing in the recently issued telephone directories for the City of Duluth. See, *Defendants' Exhibits 14 and 15.* In addition, both parties agree that one other retail store—a "Michaels' Hallmark" store in Superior, Wisconsin—uses the same name and sells ready-made picture frames.[7]

Upon this record, the Plaintiff seeks injunctive relief which would preclude the Defendants' use of the term "Michaels" in its signage and advertisements. According to the Defendants, logistical considerations, which arise from its purchase and sale of goods as a national chain-store, would prompt the closing of their Duluth store if a Preliminary Injunction should issue. If closed, the Defendants would suffer the loss of some $2.2 million in costs and expenses, and the 45 full- and part-time employees, at their Duluth store, would lose their currently gainful employment. Understandably, the Plaintiff maintains that the injunctive relief which he requests can be properly tailored so as to assure that the Defendants' store will not close, thus obviating the dire losses in investment and employment that the Defendants have predicted.

### III. *Discussion*

■■■ A. *Standard of Review.* Within this Circuit, the grant of injunctive relief requires the evaluation of the following factors:

1. The likelihood that the movant will succeed on the merits;

2. The threat of irreparable harm to the movant;

3. The balance between the harm to the movant if injunctive relief is denied and the injury that will result if the injunction is granted; and

4. The public interest.

*Woodroast Systems v. Restaurants Unlimited,* 793 F.Supp. 906, 917 (D.Minn.1992), aff'd, 994 F.2d 844 (8th Cir.1993), citing *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir.1981) (*en banc*); see also, *Cellular Sales, Inc. v. Mackay,* 942 F.2d 483, 485 (8th Cir.1991).

No single factor is dispositive, and the burden upon the movant, in demonstrating that a preliminary injunction should issue, is greater when, as here, the granting of the injunction will, in effect, substantially provide the moving party with the relief that he would obtain following a full trial on the merits. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories,* 815 F.2d 500, 503 (8th Cir.1987).

B. *Legal Analysis.* Accordingly, we examine each of the *Dataphase* factors, in turn.

■■■ 1. *The Likelihood That the Movant Will Succeed on the Merits.* The gravamen of the Plaintiff's action is that the Defendants' use of "Michaels," which is their registered service mark, conflicts with his prior use of "Michael's" and results in confusion in the consuming public and injury to him in the conduct of his business.[8] On the record before us, we have no doubt that the

---

same and it seemed unusual to have two stores of the same name offering the same services buy not related to each other. I believe the names are confusingly similar. Even the store signs were very similar.
*Affidavits of Mathias, Anderson, Zabukover, Glinsek, Beauclair, Bergman, Jegloski and Carlson.*
    In addition, the Plaintiff has offered the Affidavit of one other person who, while visiting the Defendants' store, purports to have observed "an unsatisfied framing customer who was very unhappy about the framing services provided to her." *Affidavit of Margarete Jones.*

7.  In addition, the parties have identified a "Michael's" in the business and professional listings of the Duluth Telephone Directories, but the tes-

timony is conflicting as to the types of goods and services sold by this retail outlet. The Defendants contend that the owner of this store proffers services for the manufacture of custom-made frames, while the Plaintiff contends that the owner refers any such requests to the Plaintiff's store. Given this conflicting testimony, our analysis excludes any consideration of the potential competition that this store may provide to the custom frame market in the environs of Duluth, Minnesota.

8.  As we have noted, the Plaintiff's infringement claim is premised upon the common law; the Lanham Act, Title 15 U.S.C. § 1125; and the Minnesota Deceptive Trade Practices Act, Minne-

Plaintiff has a protectible interest in his use of the term "Michael's" in his business name. His use of that term pre-dated the Defendants' registration, and has been continuous to date. See, *Wrist–Rocket Mfg. Co., Inc. v. Saunders Archery Co.*, 578 F.2d 727, 730–31 (8th Cir.1978); *Thrifty Rent-a-Car System v. Thrift Cars, Inc.*, 831 F.2d 1177, 1181 (1st Cir.1987). While the Defendants' use of their properly registered service mark is otherwise "incontestable," see *Title 15 U.S.C. §§ 1065 and 1115(b)*, that use must bow, within a circumscribed geographic area, to a prior user's adoption of the same or a confusingly similar service mark. In the vernacular of the Lanham Act, the Plaintiff is entitled to a "limited area" defense or exception to the incontestability of the Defendants' use

of a service mark. See, *Title 15 U.S.C. § 1115(b)(5)*.[9] Indeed, as we understand the Defendants' position, they offer no real challenge to the Plaintiff's use of his business name, and appear to recognize his past, continuous use of that business identity from a period of time which antedates the registration of their service mark. Rather, the Defendants contend that the use of their service mark does not present the type of consumer confusion that the law of trade-mark infringement was designed to preclude.

In determining whether the use of one service mark presents a likelihood of confusion with respect to a prior use, the following factors must be evaluated:

sota Statutes Section 325D.44. Despite their different origins, the elements of proof for each of these actions mirror each other and, in practical effect, tend to coalesce. See *Nordale, Inc. v. Samsco, Inc.*, 830 F.Supp. 1263, 1272 (D.Minn. 1993); *Alternative Pioneering v. Direct Innovative Prod.*, 822 F.Supp. 1437, 1441 (D.Minn.1993); *Multi–Tech Systems v. Hayes Microcomputer Products*, 800 F.Supp. 825, 847 (D.Minn.1992); *Scott v. Mego Intern., Inc.*, 519 F.Supp. 1118, 1137 (D.Minn.1981); *Howards Clothes, Inc. v. Howard Clothes Corporation*, 236 Minn. 291, 52 N.W.2d 753, 757–58 (1952); *North Star State Bank v. North Star Bank Mn.*, 361 N.W.2d 889, 894 (Minn.App.1985). Therefore, in addressing the merits of one such claim, we address them all.

In addition, the Plaintiff alleges a cause of action for a dilution of trade name or mark, under the recently enacted amendment to Chapter 325D., that has been codified at Section 325D.165 of the Minnesota Statutes. See, Minnesota Laws of 1994, Chapter 477 (effective April 20, 1994). In pertinent part, Section 325D.165 provides as follows:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be grounds for injunctive relief, regardless of the presence or the absence of competition between the parties or likelihood of confusion, mistake, or deception.

Although this Section has not been judicially construed, and the parties have not addressed this aspect of the Plaintiff's action on its merits, it would appear that Section 325D.165 merely codifies the common law of trade mark dilution, see, *Scott v. Mego Intern., Inc.*, supra at 1137–38, and we address this claim as such.

On the record as a whole, we are unable to conclude that the Plaintiff's assumed business identity is so distinctive and unique that, in all probability, he will succeed in demonstrating that the mere existence of the Defendants' service mark "Michaels," will adversely affect his business reputation or destroy the advertising

value of his mark. Cf., *Anheuser–Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 777 (8th Cir.1994) (applying the closely-worded Missouri anti-dilution statute). We do not suggest that the evidence is so one-sided on this issue that, as a matter of law, the Defendants are entitled to a Judgment; we merely note that the "likelihood of injury" to the Plaintiff's business reputation, or to the distinctiveness of his mark or trade name, is conjectural—at least on the basis of the limited record before us. As we note elsewhere in the text of our Opinion, the present record contains neither proof of an injury, nor a persuasive showing that the Plaintiff has been or will be harmed by the Defendants' use of their registered service mark. Accordingly, on this aspect of the Plaintiff's claim, we are unable to say that, in all probability, he will be successful on its merits.

9. In pertinent part, Section 1115(b)(5) provides as follows:

To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce. * * * Such conclusive evidence of the right to use the registered mark * * * shall be subject to the following defenses or defects:

* * * * * *

(5) That the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use and has been continuously used by such party or those in privity with him from a date prior to * * * the registration of the mark under this chapter * * *: Provided, however, That this defense or defect shall apply only for the area in which such continuous prior use is proved * * *.

(1) the strength of the trademark; (2) the similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) evidence of actual confusion; and (6) the degree of care reasonably expected of the plaintiff's potential customers.

*Anheuser–Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 774 (8th Cir.1994), citing *SquirtCo v. Seven–Up Co.,* 628 F.2d 1086, 1091 (8th Cir.1980); *Woodroast Systems v. Restaurants Unlimited,* supra at 915; cf., *Scott v. Mego Intern., Inc.,* 519 F.Supp. 1118, 1128–34 (D.Minn.1981).

Whether a likelihood of confusion exists is, ultimately, an issue of fact. *ConAgra, Inc. v. George A. Hormel & Co.,* 990 F.2d 368, 371 (8th Cir.1993); *Champions Golf Club, Inc. v. Sunrise Land Corp.,* 846 F.Supp. 742, 754 (W.D.Ark.1994). Necessarily, our analysis turns to each of these considerations.

■■■ a. *The Strength of the Trade–Mark.* "In determining whether a trade name is entitled to protection, it must first be classified into one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." *Cellular Sales, Inc. v. Mackay,* supra at 485. A "generic" term denotes a particular type, kind or class of goods or services of which an individual article or service is a member and, being a generality, it is usually a term that is open to the public domain and, therefore, is freely available for use by the public-at-large. *Id.* at 486. As a result, little weight or protection is given to a merchant's use of such a generic term. On the other hand, an "arbitrary or fanciful" mark is "a word, either known or completely out of common usage, coined for the sole purpose of identifying products in the market place." *Woodroast Systems v. Restaurants Unlimited,* supra at 911, quoting *Aveda Corp. v. Evita Marketing, Inc.,* 706 F.Supp. 1419, 1428 (D.Minn. 1989). Such marks are deemed the strong-

est "because their inherent novelty creates a substantial impact on the buyer's mind." *Id.* The intermediate types of marks—suggestive and descriptive—have been described as follows:

> Suggestive marks subtly indicate something about the product, thus a mark is deemed suggestive if its requires imagination, thought or perception to reach a conclusion concerning the nature of the goods. * * * A descriptive mark immediately conveys characteristics, qualities or other features of a product and can be protected only if its has become distinctive by acquiring a secondary meaning.

*Woodroast Systems v. Restaurants Unlimited,* supra at 911–12, citing *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 939 (10th Cir.1983), and *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 625 (8th Cir.1987).

In the final analysis, the classification of a given term, within one of these categories, is a factual determination. *WSM, Inc. v. Hilton,* 724 F.2d 1320, 1326 (8th Cir.1984).

■■■ Notwithstanding the arguments on either side, at this juncture, we are not persuaded that the Plaintiff's mark is either arbitrary or fanciful—as the Plaintiff argues, or a descriptive term, as urged by the Defendants. The problem is one of selectivity. While the Plaintiff seeks to focus our attention on the term "Michael's," he has not consistently utilized that term in isolation. In fact, the evidence before us demonstrates that the Plaintiff's most extensive and consistent use of a business identifier is reflected in the signage above the entry to his business premises, and in his advertisement in the Duluth City Directory. In neither of these usages did the Plaintiff restrict his reference to the term "Michael's" and the record is devoid of any showing as to when he may have advertised using "Michael's" as the short-hand title for his business identity.[10]

---

10. The Plaintiff has provided the Court with the types of advertisements that he has published from time-to-time. These advertisements are not time-specific, and the evidence establishes no more than that the Plaintiff has "used the name Michaels in connection with this business since

1979." *DeRosier Affidavit of October 4, 1994,* at page 2. When the use of "Michael's," alone, was promoted by the Plaintiff is not established in this record.

If the Plaintiff is unable to demonstrate an adoption of the term "Michael's" as his business

In this same respect, we find it notable that, apart from his current claim, the Plaintiff has not challenged anyone's use of the term "Michaels" as a business identifier, even within the market area in which his business is located and even when the use is adopted by a competitor. While the Plaintiff suggests that the use of the term "Michaels' " by a merchandiser in Superior, Wisconsin, is unobjectionable since it is in conjunction with the name "Hallmark," we view that suggestion as more properly an acknowledgement that an accurate identifier of the Plaintiff's business is not encompassed by the name "Michael's," but is more aptly embodied in the business legends that he has long employed: "Michaels Framing Center/Art Gallery" and "Michael's Frame & Gallery." Accordingly, we find that a material issue of fact envelops the classification of the Plaintiff's mark, and that this factor does not presently play a decisive role in our analysis of the likelihood that customer confusion has been generated by the Defendants' use of their registered service mark.

b. *The Similarity Between the Respective Marks of the Parties.* Here again, our analysis turns on the ascertainment of the Plaintiff's true business identity. We find only an oblique similarity in the signage of the two business establishments and, were such comparisons sufficient, we would be hesitant in concluding that any responsible consumer could objectively view the signage of the Defendants as sufficiently imitative of the Plaintiff's so as to be misleading. See *General Mills, Inc. v. Kellogg Co.,* supra at 627 ("The use of identical, even dominant, words in common does not automatically mean that two marks are similar."); *Gold Seal, Inc. v. Scent Shop, Inc.,* 851 F.Supp. 1283, 1285 (E.D.Ark.1994). Such a superficial comparison, however, is not probative in and of itself. Rather, "[a] realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine not what it would do, but what a reasonable purchaser in market conditions would do." *Calvin Klein Cosmetics Corp. v. Lenox Laboratories,* supra at 504. Given the vastly different images reflected by their business signage, facades and inventory, we have substantial doubt that any reasonable purchaser would mistake the Plaintiff's business for the Defendants' or *vice versa.*

c. *The Competitive Proximity of the Parties' Products.* Without dispute, the only areas in which the parties' inventory overlap are in the sale of ready- and custom-made framing and, to a lesser extent, in the catalog ordering of pictorial reprints and posters. Even in these respects, the overlap appears to be fairly diminutive. The Manager of the Defendants' store disclaimed any direct competition with the Plaintiff's custom framing services since, in his view, the Plaintiff performs gallery-quality framing—the type that would preserve fine art from environmental damage—which the Defendants do not provide. This testimony was not directly controverted by the Plaintiff. Moreover, the Defendants' sale of ready-made frames accounts for less than 8% of their sales and, on the record before us, would appear to be indistinguishable from the sale of the same goods by "Michaels' Hallmark," whose service mark and competition are not now, and have not previously been, challenged by the Plaintiff. Given the vast differences in their inventories, we are unable to find a plausible basis to believe that the products that the parties retail could instill any substantial confusion in the minds of the purchasing public.

d. *The Alleged Infringer's Intent to Confuse.* On this record, there can be no serious contention that the Defendants deliberately or willfully sought to infringe the Plaintiff's trade name. At most, the Defendants can be

---

identity, prior to the registration of the Defendants' service marks, then his burden of persuasion would appear to be far more onerous, given the "incontestability" of the Defendants' proper use of their mark following its registration. The fact that some customers may have thought of the Plaintiff's store as being "Michael's" is not necessarily proof of his adoption of that business identity, absent a showing that the identity was

promoted by advertising or some other affirmative act. See, e.g., *State, by Anderson v. Reward Corp.,* 482 N.W.2d 815, 819 (Minn.App.1992), quoting *Aveda Corp. v. Evita Marketing Corp.,* 706 F.Supp. 1419, 1427 (D.Minn.1989) ("No rights accrue to one who merely selects a trademark without actual use of it in the advertising or sale of goods.").

chided for failing to undertake the type of market research that would have disclosed the presence of any preexisting uses of service marks which could be confused with their own. Nevertheless, the evidence is uncontested that, at least since 1987, the Defendants' service mark has not been challenged elsewhere, despite the rapid expansion which they have experienced in recent years, and notwithstanding the commonality of their business name.[11] Accordingly, there is no proof that the Defendants have intended to infringe upon the Plaintiff's service mark either before or after the opening of their store in Duluth.

e. *Evidence of Actual Confusion.* Although the Plaintiff has underscored the apparent confusion that the opening of the Defendants' store has generated—at least in the minds of eight Affiants—we find this evidence to be insufficient to create a credible inference of confusion.[12] Understandably, a similarity in business names may precipitate inquiries as to the interrelationship, if any, between those businesses, but the conclusory observations of the Affiants, that the business "names are confusingly similar," is not persuasive evidence of actual confusion.[13] Nor are we persuaded that telephone calls to the Plaintiff's store, which were related to hobby and craft inquiries, substantiate a concern over consumer confusion. If the telephone inquiries continued, after the publication of a separate listing for the Defendants' store, then a more plausible inference of confusion might be drawn. Here, however, it is undisputed that a resort to the telephone directory for the City of Duluth, in search of a store name that is prefaced with the term "Michaels," would either produce the Plaintiff's number or that of a ceramic craft store that is unrelated to any of the parties to this proceeding. The Plaintiff's evidence of actual confusion is vaguely suggestive, at best.

f. *The Degree of Care Reasonably Expected of the Plaintiff's Potential Customers.* Stated somewhat differently, "[t]he cost and type of service involved is also relevant to the likelihood of confusion[,]" since "[c]onfusion is more likely to occur in situations where the services or goods are relatively inexpensive because consumers typically exercise less care when making such choices than when choosing more expensive goods or services." *Woodroast Systems v. Restaurants Unlimited,* supra at 915, citing *SquirtCo v. Seven–Up Co,* supra at 1091, and *Beer Nuts, Inc. v. Clover Club Foods Co.,* supra at 941. Despite the Defendants effort to characterize the Plaintiff's customers as "sophisticated" patrons of the arts, we find such an inference somewhat overdrawn. Nevertheless, relying upon the Plaintiff's own advertisements, we are satisfied that the services he provides exceed the ordinary needs of custom framing. As the Plaintiff's earliest advertisement advises, the Plaintiff has "A Noted Reputation For Fine Custom Framing In All Mediums, Watercolor, Oils, Prints, Photos And Graphic Arts, Specialized Service in Mounting Needlework, Stained Glass, Object Box-

---

11. In 1984, the Defendant owned a total of twelve stores. In 1993, alone, the Defendants "opened 52 new stores domestically and entered seven new states." *Michaels Annual Report 1993,* at page 2. In 1994, 70 to 75 additional stores were planned for the United States and Canada, with the Defendants' corporate goal being a business expansion of 30% annually. *Id.* at 3.

12. The Defendants appear to suggest that the Plaintiff is obligated to fortify his allegations of actual confusion with the results of a professional marketing survey. While such evidence may be helpful to the Plaintiff's case, it is not indispensable. As our Court of Appeals has recently observed, "surveys can be used to show actual confusion, but their evidentiary value depends on the relevance of the questions asked and the technical adequacy of the survey procedure." *ConAgra, Inc. v. George A. Hormel & Co.,* 990

F.2d 368, 370 (8th Cir.1993), quoting *Coherent, Inc. v. Coherent Technologies, Inc.,* 935 F.2d 1122, 1126 (10th Cir.1991).

13. We do not suggest that Affidavits, which are submitted in support of a Motion for a Preliminary Injunction, should be held to the scrutiny prescribed by Rule 56(e), Federal Rules of Civil Procedure. See generally, *11 Wright and Miller, Federal Practice and Procedure, § 2949, at p. 472 (1973).* Nevertheless, we need not ascribe significance to an Affiant's expression of a confused state, which is without a foundational basis in fact. We do not believe, based solely upon the evidence before us, that a reasonable consumer could tour the respective businesses of these parties and, notwithstanding the substantial differences in their product lines, express confusion as to the separate standing of the two commercial ventures.

es, Etc." Given these parameters, we think it reasonable to infer that a responsible patron of the Plaintiff's would not be mislead into believing that the framing services of the Defendants, which even they do not ascribe as being in direct competition with the Plaintiff, were truly those of the Plaintiff.

g. *Summary.* In deciding whether there is a likelihood of confusion, "[e]ach factor must be considered and excessive weight should not be given to any one factor to the exclusion of others." *ConAgra, Inc. v. George A. Hormel & Co.,* supra at 777. As the foregoing should make clear, we have employed such a balancing in our appraisal of the "likelihood of confusion" issue.

Lastly, as a summary observation, we would note that the circumstances before us are closely reminiscent of those which confronted the Minnesota Supreme Court in *Howards Clothes, Inc. v. Howard Clothes Corp.,* supra. There, the Court considered the similarities between two haberdasheries, each of which sold a closely related inventory of merchandise under a nearly indistinguishable set of business names. Nevertheless, the Court recognized distinctions in the scope of advertisements—national versus local, in the selling prices of the goods, in the conduct and frequency of sales promotions, and in other subtle contrasts, which warranted the Court's conclusion that the patrons of the two stores would not have been confused as to their disconnection. The result we reach is closely guided by the analysis contained in that seminal decision.

Viewing the evidence as a whole, we are unable to conclude that, in all probability, the Plaintiff will succeed in demonstrating a likelihood of confusion that results from the Defendants' use of their registered service mark.

2. *The Threat of Irreparable Harm to the Movant.* "In evaluating the threat of irreparable harm, the court may also consider the potential loss of control over the quality of a plaintiff's services, and the risk of damage to a plaintiff's reputation and service mark from the continued use of an infringing mark." *Woodroast Systems v. Restaurants Unlimited,* supra at 918, citing *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903,

908–09 (7th Cir.1986). Here, however, the Plaintiff has not established that the Defendants' framing operations will either disparage the Plaintiff's reputation or jeopardize, in any realistic sense, the Plaintiff's control over the public's perception of the quality of his own services. While the Plaintiff did proffer the Affidavit of one of his customers, which recounted her observation of what she regarded as a customer's complaint over the quality of the Defendants' services, this showing is so attenuated as to be probatively inconsequential.

Moreover, we may not casually overlook the absence of any showing that the Plaintiff has suffered any verifiable loss of sales to date. Although the Plaintiff has intimated that his record-keeping does not readily permit the type of financial reporting that the Defendants have presented, we find such an implication unconvincing. We are confident that, given the Plaintiff's recognition of the harshness of the relief he has requested, he has carefully reviewed his accounts and his historic sales figures so as to isolate any adverse impacts which may be attributable to the opening of the Defendants' store. Nonetheless, the most that the Plaintiff may assert, over three weeks after the commencement of the Defendants' competition, is that the traffic in his store may be down somewhat. Notably, the Plaintiff has not demonstrated that his losses are incalculable. As a practical matter, since the Plaintiff has not audited his sales since the opening of the Defendants' store, he flatly admits that he does not know whether his sales have increased or decreased. Accordingly, on the record before us, we conclude that the Plaintiff has failed to establish that he will suffer irreparable harm absent the issuance of a Preliminary Injunction.

3. *The Balance of Hardships.* Beyond evaluating the threat of irreparable harm to the Plaintiff, the Court is obligated to determine whether the harm to the Plaintiff, if the Injunction should be denied, exceeds the expected harm to the Defendants if the Injunction were issued. *Aveda Corp. v. Evita Marketing, Inc.,* supra at 1431. Here, the Defendants assert that the issuance of

the injunctive relief, that the Plaintiff requests, is tantamount to a closing of their retail store in Duluth. Although we have no way of knowing, we are not disposed to accept, as probable, the dire consequences that the Defendants have projected if an Injunction were to issue.[14] Nevertheless, we are not unmindful of the significant expenses that the Defendants have incurred in opening and staffing its store in Duluth and, undoubtedly, a stringent constriction on their capacity to advertise would cause additional expense and might well jeopardize the employment opportunities of some of its employees. We have no correlative showing that a failure to issue the requested Injunction would impose any additional burden or expense on the Plaintiff's business interests. As a consequence, while we do not regard this factor as bearing heavily in the Defendants' favor it, nonetheless, weighs more heavily in that direction than for the Plaintiff's benefit.

4. *The Public Interest.* Lastly, we are obliged to balance the potentially conflicting public interest in protecting the consuming public from deceptive commercial practices, with the public good that is advanced by an actively competitive market place. *Woodroast Systems v. Restaurants Unlimited,* supra at 919. Based upon the limited record before us, we find the presence of the Defendants' commercial operations in Duluth to promote a competitive market in the craft and hobby trades and, to a lesser extent in the field of framing services,[15] and we find no compelling demonstration that the public's interest, in curbing deceptive sales practices, has been impeded in any critical respect.

In sum, having carefully considered the relevant factors which govern our analysis, and the full expanse of the evidence before us, we find and conclude that, on balance, those factors preponderate against the issuance of a Preliminary Injunction.

THEREFORE, It is—

RECOMMENDED:

That the Plaintiff's Motion for a Preliminary Injunction [Docket No. 5] be denied.

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D.Minn. LR1.1(f), and D.Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than November 23, 1994,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than November 23, 1994,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. § 636 to review the transcript in order to resolve all of the objections made.

---

14. We have already noted the closely paralleling circumstances that the Minnesota Supreme Court addressed in *Howards Clothes v. Howard Clothes Corp.,* supra, which, among other matters, illustrates the precision with which a Court may tailor its injunctive relief so as to remedy a demonstrable inequity in a competitive market. While, given the recommendation we make, we do not reach the issue of the proper scope of any injunctive relief, it seems indisputable that, as the intrusive nature of any Injunction is diminished, so is its probable economic impact upon the Defendants. Nevertheless, we have evaluated the "balance of hardship" issue according to the evidence both of the parties have submitted for our review.

15. In analyzing its potential market in Duluth's economy, the Defendants viewed a Ben Franklin Store and Northwest Fabrics and Crafts as its principal competition. In contrast, the Defendants estimated that there were 30 or more businesses in the Duluth market which offered custom-framing services.